UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION



PFM AIR, INC.,
GOEDICKE INC OF AMERICA,
PETER COLLINSON FAMILY, LP,
AB CONSULTING, INC.,
PACIFIC AEROMARINE, INC.,
CHUCK HOFFMAN, ELMER
LINWOOD JOHNSON, JACK
WILLIAMS, and DOUG SHEFFIELD,

        Plaintiffs,

v.

DR.ING.HC.F.PORSCHE A.G.,
PORSCHE CARS NORTH
AMERICA, INC., PORSCHE
AVIATION PRODUCTS, INC.,
and GARY BUTCHER,

        Defendants.

CASE NO. 8:08- Cv-392-T-17MSS

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

COME NOW, Plaintiffs PFM Air, Inc., Goedicke Inc of America, Peter Collinson

Family, L.P., AB Consulting, Inc., Pacific Aeromarine, Inc., Chuck Hoffman, Elmer

Linwood Johnson, Jack Williams and Doug Sheffield, and file their Original Complaint

against Defendants, Dr.Ing.hc.F.Porsche A.G., Porsche Cars North America, Inc., Porsche

Aviation Products, Inc., and Gary Butcher and, for cause, would respectfully show unto the

Court as follows:

## PARTIES

1.      Plaintiff PFM Air, Inc. ("PFM Air") is a Florida corporation, with its principal place of business in Manatee County, Palmetto, Florida.  In exchange for good and valuable consideration, PFM Air is the assignee of all legal claims connected with the ownership of three (3) Mooney PFM aircraft (including one M20K), eleven (11) Robin PFM aircraft and two (2) Cessna PFM aircraft.

2.      Plaintiff Goedicke Inc of America ("Goedicke") is a Florida corporation, with its principal place of business in Manatee County, Palmetto, Florida.

3.      Plaintiff Peter Collinson Family L.P. ("Collinson") is a North Carolina limited partnership, with its principal place of business in North Carolina.

4.      Plaintiff AB Consulting, Inc. ("AB Consulting") is an Ohio corporation, with its principal place of business in Ohio.

5.      Plaintiff Pacific Aeromarine, Inc., ("Pacific Aeromarine") is a California corporation with its principal place of business in California.

6.      Plaintiff Doug Sheffield ("Sheffield") is an individual who is a citizen of the State of Colorado.

7.      Plaintiff Linwood Elmer Johnson ("Johnson") is an individual who is a citizen of the State of South Carolina.

8.      Plaintiff Chuck Hoffman ("Hoffman") is an individual who is a citizen of the State of California.

9.      Plaintiff Jack Williams ("Williams") is an individual who is a citizen of the State of California.

10. Goedicke, Collinson, AB Consulting, Pacific Aeromarine, Johnson, Hoffman, Sheffield and Williams each own Mooneys with Porsche PFM 3200 engines ("Mooney PFM") originally installed in their airframes, totaling nine (9) aircraft. (Goedicke owns two (2) aircraft)

11. The twelve (12) Mooneys ("American Fleet") involved in this action, received their initial airworthiness certification from the FAA, after their assembly at Mooney Aircraft Corporation ("MAC") headquarters, located in the United States. The eleven (11) Robins and two (2) Cessnas ("European Fleet") involved in this action, were manufactured, sold and maintained in Europe. Accordingly, the Porsche PFM 3200 engines were installed in these aircraft overseas.

12. Defendant Dr.Ing.hc.F.Porsche A.G. ("PAG") is a corporation organized under the laws of Germany, with its principal place of business in Stuttgart, Germany. PAG is the parent company of Defendants Porsche Cars North America, Inc., and Porsche Aviation Products, Inc.

13. Defendant Porsche Cars North America, Inc. ("PCNA") is a Delaware corporation, with its principal place of business in Atlanta, Georgia.

14. Porsche Aviation Products, Inc. ("PAPI") is a Delaware corporation, with its principal place of business in Atlanta, Georgia.

15. PAG, PCNA and PAPI (collectively, "Porsche Defendants") have, at all times relevant, been collectively involved in the marketing, sale and orchestrating the worldwide elimination of all aircraft fitted with PFM engines. PCNA and PAPI are subsidiaries of PAG. Porsche Defendants have acted in unison and as each other's alter-ego during the

events at issue, or in the least, have held themselves out as agents of one another.

16. Defendant Gary Butcher ("Butcher") is an individual who is a citizen of the State of Nevada. At all times relevant, Defendant Butcher was an employee of PCNA and PAPI, in addition to holding himself out as an agent of PAG. This principal-agent relationship is evidenced by PAG's control and/or ratification of Butcher's continuous work during the events at issue in this litigation.

## JURISDICTION AND VENUE

17. This Court has diversity jurisdiction over this litigation pursuant to 28 U.S.C. §1332(a). As previously mentioned, Plaintiffs are citizens of the States of Florida, North Carolina, Ohio, Colorado, California, and South Carolina. Defendant PAG is a citizen of Germany, Defendants PCNA and PAPI are a citizens of the State of Georgia and Butcher is a citizen of Nevada. The amount in controversy exceeds the sum of $75,000 exclusive of interest and costs. The Court has personal jurisdiction over Defendants because, as more fully detailed herein, Defendants have minimum contacts with the State of Florida, such that this Court's exercise of jurisdiction over them will not offend traditional notions of fair play and substantial justice. Plaintiffs' claims arise in whole or in part as a result of Defendants' contacts and conducting business in the State of Florida such that Defendants purposefully availed themselves of the benefits of the law of Florida.

18. Venue is proper in this Court because Plaintiffs PFM Air and Goedicke have their principal place of business in Manatee County, Palmetto, Florida. Additionally, this is the district where a substantial part of the events, acts, and omissions giving rise to the claims asserted herein occurred.

## GENERAL ALLEGATIONS

### A.    On The Heels Of It's Success In The Automobile Industry, Porsche Enters The Aviation Market.

19.    For decades, the trade name "Porsche" has been synonymous with excellence, performance and reliability. "Porsche, there is no substitute," has become one of the most recognized catchphrases in automotive history. From the famous one-liner spoken by Tom Cruise in the blockbuster 1980's hit, *Risky Business*," to the countless magazine and other advertisements containing that phrase, Porsche and those five words have become legendary. Riding that wave of notoriety, Porsche decided to enter the Aviation market. In that arena, Porsche has also been known for the production of engines utilized by the aviation industry.

20.    In 1985, Porsche introduced the PFM 3200 engine ("PFM" or "PFM engine"), which was a close derivative of the six-cylinder Porsche 911 engine, except modified for air travel ("PFM program"). Eager to benefit from Porsche's brand name recognition, Mooney Aircraft Corporation, Reims Aviation and Avions Robin were the first airframe manufacturers to market and employ the PFM engine in production models of their aircraft. The PFM engine came in several versions, with the N01, N02 and N03 models being the most common. Identical in design, these versions only differed slightly in their respective horsepower or requisite fuel type. The N01 version allowed for leaded fuel.

21.    By 1987, the Porsche-powered Mooney M20L, Reims-Cessna F182Q and Robin DR400RP aircraft were being sold to consumers. All three airplanes were four-seat, fixed wing, single engine aircraft. Prior to entering the stream of commerce, an aviation-related manufacturer such as PAG, must first apply for a certificate with its country's

aviation authority, such as the Federal Aviation Administration ("FAA"). This certificate is uniformly referred to as a Type Certificate ("TC"), which functions essentially as a patent in the context the Federal Aviation Regulations ("FAR"). All production of their respective PFM engines took place at the headquarters of Defendant Dr.Ing.hc.F.Porsche A.G. ("PAG"), located just outside of Stuttgart, Germany.

22.     Pursuant to the FAR, all aircraft are divided into varying categories depending upon size, weight and intended use. For every aircraft in operation, its respective airframe, engine and propeller must each be assigned to a separate TC. The application process for a TC is similar to that of a patent, although more rigorous. Prior to approval, the FAA conducts extensive tests on the TC and requires the prospective holder to develop and implement a safety program which includes, *inter alia*, reporting, tracking and resolving any technical issues associated with the TC as they relate to safety and airworthiness.

23.     This TC remains the proprietary property of the holder indefinitely, unless surrendered and/or revoked by the TC issuing country's aviation authority. Accordingly, competition is limited to only those persons who obtain authorization via written licensing agreements from the TC holder. Whether the TC holder intends to manufacture the product, or authorizes another to do so, production of the aviation component to which the TC is assigned cannot commence without the requisite production certificate, which the FAA only issues subsequent to a thorough examination of the production facilities. Holders of production certificates are additionally required to establish and implement a quality control system that insures the product does and will continue to comply with the TC's intended design and standard of quality. Production certificates however, are not transferable, even by

6

the TC holder. Accordingly, even a TC holder cannot produce replacement parts without also holding the production certificate. Therefore, any person other than the holder of the production certificate, wishing to produce replacement or modification parts, must seek FAA authorization by other means, such as a Delegation Option Authorization ("DOA") or Parts Manufacturer Approval ("PMA").

24.     Despite these and many more rules and regulations set forth by the FAA, PAG was able to avoid this procedure under the FAR and acquire a TC in the United States, by virtue of the German aviation authority, the Luftfahrt-Bundesamt ("LBA") having already issued the same TC. In scenarios such as this, the FAA must recognize a foreign TC holder's status, and grant it full faith and credit, provided that the TC holder's country of domicile has a reciprocal treaty with the U.S., and that country's aviation laws require a heightened standard of safety similar to that of the United States.

25.     From the time the PFM engine was first introduced, the airplanes it powered were advertised as high performance aircraft with unparalleled manufacturer support. To make the purchase of this engine even more attractive, Porsche Defendants represented that they would stand behind their product, guaranteeing quality service. Porsche Defendants offered an "unmatched" warranty program, designed to add value to an already rare and expensive product. Unfortunately, there was a product defect that Porsche Defendants were committed to not reveal.

**B.    The Porsche Warranty Program for the Mooney M20L/K Aircraft.**

26.     PAG first acquired the TC for the PFM engine in 1985 and Porsche Defendants immediately began a marketing campaign which took full advantage of the

7

Porsche 911 car engine's notoriety and success, which is evident from promotional materials stating:

> Technical superiority and day-to-day reliability – these proven features form the basis for a totally new aircraft engine; the PFM 3200. This six-cylinder unit, derived from the engine used in the 911 sports and grand touring cars, could now set new standards of technical efficiency and economy for aircraft engines.

27.     This publicity instantly caught the attention of Mooney Aircraft Corporation ("MAC"), who began to pre-sell the Porsche-powered Mooney M20L with a PFM engine ("Mooney PFM") within the next two years. As a marketing ploy, MAC and Porsche Defendants orchestrated a flight around-the-world in a Porsche-powered aircraft. Because the M20L airframe was still being perfected, a PFM engine was initially installed in a Mooney 252 ("M20K") aircraft. This M20K was the focal point of Porsche Defendants' initial media campaign. This around-the-world tour, emphasizing the PFM's endurance and quality design, was specifically devised to catapult Porsche Defendants into the aviation industry, utilizing Porsche's automotive brand name recognition. Unfortunately for Porsche Defendants, the aviation industry was not an easy market to enter, in the United States or elsewhere in the world.

28.     MAC has a history of manufacturing airframes with an emphasis on speed, similar to the reputation PAG and PCNA held for luxury automobiles. However, relative to its competitors, Lycoming and Continental, the PFM did not generate a faster aircraft, despite its considerable 217 horsepower in version N03. This disappointing result was largely attributed to the engine's design; a reality not uncommon when modifying an automobile

engine for use in aviation. For example, PAG utilized six cylinders rather than four. If speed was of primary concern, the excess weight of the additional two cylinders (and related components) could have been avoided. The PFM engine's air-cooling feature was generally better suited for automobile travel. Its function within the cowling (engine cover) inadvertently generated a "cooling drag" effect, which resulted in diminished airspeed.

29. Nonetheless, the "status" symbol associated with owning a "Porsche" brand aircraft was no different from the prestige of owning its automobile counterpart. Porsche Defendants even published advertisements offering a free one-year lease of a Porsche automobile with the purchase of the Porsche-powered Mooney aircraft. When prospective owners learned that only forty-one (41) Mooney PFM's would ever be manufactured, this aircraft's intrinsic value and desirability only increased.

30. In addition, the Mooney PFM's fuel efficiency was unmatched, burning at least thirty (30) percent less fuel than even today's modernized power plants. However, it was the Customer Assurance and Warranty Program ("warranty program") that distinguished the PFM from its competitors.

31. The Porsche warranty program came in three parts. First, was the Limited Warranty, which guaranteed the product free from defects in material and workmanship appearing within one year or 500 hours, whichever occurred first, after the date the engine was first operated for use other than necessary flight tests and required ferry or delivery flight by the most direct route. PAPI promised to reimburse the owner for the engine, parts and labor according to the Warranty Labor Allowance Scheduled, which it published from time to time.

32.     Next was the Cost Assurance Program, which read in part:

Porsche Aviation Products, Inc. ("Porsche Aviation") agrees to reimburse the owner of any Porsche PFM 3200 N03 engine for all Qualified Unscheduled Maintenance Expenditures in excess of $2,500 and incurred by the owner during the time period from the date of the first retail sale to five years after the date of the first retail sale or during the time period from the date of the first retail sale and the attainment of the applicable recommended time between overhaul ("TBO"), the first to occur (hereafter referred to as Qualified Unscheduled Maintenance Expenditures).

\* \* \* \*

Qualified Unscheduled Maintenance Expenditures shall be the labor and parts required to perform unscheduled maintenance on the following items: (1) basic engine; (2) propeller gear box; (3) electronic ignition control box; (4) ignition coil; (5) electric fuel pump; (6) alternators; (7) starter and automatic fuel injection systems. For purposes of the Cost Assurance Program, the costs of all parts shall be based upon the lesser of the suggested retail price or actual price paid and the cost of the labor shall be a reasonable labor rate in accordance with the Warranty Labor Allowance Schedule published from time to time by Porsche Aviation.

33.     Finally, PAPI offered the Guaranteed Exchange Remanufactured Engine

Price, which read in part:

Subject to the terms and conditions set forth below, Porsche Aviation Products, Inc., ("Porsche Aviation") agrees to provide the purchaser of an aircraft powered by a Porsche PFM 3200 N03 engine ("Engine"), a remanufactured engine at the specific prices set forth herein ("Specific Price") **at such times as the engine attains the applicable recommended time between overhaul** ("TBO").
The Guaranteed Price period shall be ten years from the date of the first retail sale of a new aircraft powered by a Porsche PFM 3200 N03 engine as reflected in the FAA ownership records.  The Specific Price shall be as follows:
1.      During the first five year period from the date of the

first retail sale of the new aircraft, a price quoted to the owner in writing by Porsche Aviation ("Guaranteed Base Price") at or about the time of sale;

2.     During the sixth through tenth year of ownership, the Guaranteed Base Price shall be the Guaranteed Base Price published on the model engine, forty eight months prior...

34.     PAPI also set forth its policy regarding the transferability of warranty coverage, which read:

The Porsche Limited Warranty, Cost Assurance Program and the Guaranteed Exchange Remanufactured Engine Price program is automatically transferred without cost of the ownership of the engine changes within the prescribed period and the previous owner has complied with all the terms and conditions thereof. To keep the Customer Assurance Program in effect, the new owner must continue to comply with all the terms and conditions specified.

35.     To no surprise, this warranty program was well received by the aviation community, as this warranty was directly tied to the engine's actual flight time, as opposed to any other standard of measurement. As long as the owner met certain conditions (i.e., 100 and 500 hour inspections, 1000 hour top overhaul, and a 2000 hour complete engine remanufacture or exchange; *See* Exhibit A, page 7) the warranty program continued in effect indefinitely, and actually locked PAPI into a predetermined engine replacement price for ten years subsequent to its first retail sale. (A true and correct copy of the warranty program in its entirety is attached and hereinafter referenced as "Exhibit A.") Needless to say, this unique warranty program departed significantly from the industry standard.

36.     The warranty program was certainly praised by aviation publications. For example, the January 1988 issue of *Flying* ran an article which read in part:

Under this warranty you will pay no more than the fixed cap

price for unscheduled maintenance over the entire TBO life of
the engine.

* * * * *

Unlike many other engine warranties, the Porsche cost-cap
system will transfer to subsequent owners and, most
important, there are no flying minimums. The traditional pro
rata TBO warranty of engines is based on 40 hours of flying
per month. If a 2,000 hour TBO engine, for example,
develops problems after two years of service, the pro rata
clock has ticked off 960 hours even though the owner may
have flown no more than a couple of hundred hours. That
means the warranty will pay for only half the costs, because
under this accounting system half of the engine has been used
up. With Porsche, if it takes 10 years to get to TBO you still
get the same coverage.

*Plane and Pilot* ran a February 1988 article which read in part:

After the first year, all unscheduled maintenance up to $2,500
is the responsibility of the owner after which Porsche will
cover everything out to five years. Buyers who purchase a
1988 PFM Mooney will be guaranteed a price of $14,000 for
a factory reman at the 2000-hour TBO, no matter what
happens to inflation or the exchange rate. In other words, the
most you could possibly spend per hour on engine overhaul
and maintenance allowance is $8.25

**C.**     **Porsche Reaches Agreements to Install the PFM Engine in the Reims-Cessna
F182Q and Robin DR400RP Aircraft.**

37.     Across the Atlantic Ocean, Porsche Defendants were also busy securing

contracts with Avions Robin and Reims Aviation to install PFM engines in their respective

aircraft. Similar to the sentiments of consumers in the United States, the luxury brand name

"Porsche" was a recognized and highly regarded automobile. Such notoriety was also

projected onto this airplane with a Porsche logo inscribed conspicuously on the nose of the

aircraft, just behind the propeller.

38.     In 1987, the French company Avions Robin began manufacturing the Robin DR400RP Remorqueur aircraft, fitted with the PFM engine, version N01 ("Robin PFM"). In French, "Remorqueur" literally means, "a boat made for hauling large vessels at sea" or "tugboat." This definition is suitable, considering the Robin PFM was essentially designed for pulling glider planes, a popular recreation in France and Germany.

39.     The Robin has been in use for half a century. Regarded as the most popular light aircraft in Europe, roughly three thousand Robins are in existence today. Following a long standing tradition, the Robin's airframe continues to be made entirely of wood and fabric. In February 1994, *AOPA* published an article describing the Robin PFM's production. It read in part:

> A DR 400's life begins when the man in charge of Robin's wood work, Daniel Coulaud, goes to Brussels, Belgium, to choose among the logs imported from Oregon, Washington, and British Columbia. Based on his intuition and experience, he picks the best Douglas fir, Oregon pine, and Sitka spruce. Coulaud's choice is critical. After the wood is cut, it will take a year to cure. Only then will he know if it passes muster as aircraft grade, acceptable to Robin standards. By the way, all of Robin's wood is given the rot-proofing and anti-fungus treatments.

> It takes about 1,200 man-hours to build a DR 400, and most of the work requires the skill of a dedicated craftsman. It's a process that's long on expertise and short on tooling. Saws and templates, glues, clamps and sanders are the stock in trade on the DR 400 line, not rivet guns and a whole lot of power tools. Spend a little time in the assembly areas, and you'll see that the workers take great care and pride in practicing their somewhat old-fashioned art.

40.     It comes to no surprise that when Avions Robin introduced the Robin PFM, many airplane enthusiasts wanted one for themselves. However, only thirty-eight (38) Robin

PFM's were ever produced during the course of two years. Similar to the Mooney PFM, the Robin PFM was a rare type of airplane, perhaps destined to become a valuable collector's item.

41.     During the same time period Robin PFM's were manufactured, Porsche Defendants were also approached by Reims Aviation, another French aircraft manufacturer, who wanted to install the PFM engine in their Cessna F182Q aircraft ("Cessna PFM"). The 182 model, rated the world's second most popular Cessna (after the 172 model), has been in production since 1956, and marketed under the name "Skylane."

42.     In addition to private recreational use, the Cessna aircraft has been commonly employed by the Civil Air Patrol ("CAP"), utilizing satellite digital imagining for search and rescue operations, in addition to commercial photography.

43.     Similar to the Mooney PFM and Robin PFM, the Cessna PFM offered the same level of quality and performance associated the Porsche brand name, but was even harder to acquire. Manufactured in PAG's factory in Germany, the Cessna PFM model was discontinued only months after the last one was produced in July of 1990. In fact, of the four (4) Cessna PFM ever produced and only two (2) are currently in existence (one N01 version and one N03 version).

44.     Unfortunately, after the production of these two aircraft, PAG unexpectedly announced its plans to cease production of PFM engines for use in new aircraft. Such decision was calculated and was the first indication of PAG's willingness to alienate its loyal aviation consumer base.

**D.  Porsche, "Is There a Substitute?" The PFM Engine's Defective Design.**

45.  For the most part, Plaintiffs and other unnamed Mooney PFM owners had to negotiate with Gary Butcher, Porsche Defendants' employee and spokesperson, in the purchase and/or the continued maintenance of the American Fleet.  In addition to his intermittent role as a Mooney PFM aircraft sales representative, Butcher held the title of Products Support for Defendant PAPI and personally traveled around the United States making repairs on PFM engines when necessary.  Based on representations made by Butcher and/or Porsche Defendants, owners of these aircraft, including Plaintiffs, hoped to own and enjoy the use of these aircraft and to receive the benefit of the bargain, as they were unique and purportedly outperformed their competitors.

46.  For purposes of airworthiness and warranty assurance, PFM engines were required to undergo periodic inspections as required by its engine maintenance manual and the warranty program.  Butcher, as Porsche Defendants' key employee and agent, spear-headed this entire process under the close supervision of PAG, PCNA, and PAPI.  Butcher received instructions directly from PCNA and/or PAG with regard to PFM engine maintenance, parts support and implementing the warranty program.

47.  Aircraft in the European Fleet were manufactured, sold and maintained in Europe and owners of these PFM aircraft hoped to own and enjoy their use, and to receive the benefit of the bargain, as they were unique and purportedly outperformed their competitors.  However, because the European fleet utilized virtually identical engine components as those of the American Fleet, a majority of their engine replacement parts were manufactured, stored and/or distributed from within the United States.  For example,

15

whenever a Robin PFM or Cessna PFM was due for a 100 hour inspection, PAG was required to order replacement parts from PCNA or PAPI, whose headquarters were located in the United States. Accordingly, PAG has availed itself of the laws of the United States when it purposely designated the United States as the point of origin for PFM engine parts, in addition to its involvement with the Mooney PFM program.

48. Shortly after production of the last PFM engine in 1990, and unbeknownst to all PFM airplane owners worldwide, Porsche Defendants secretly abandoned their role as exclusive manufacturer of PFM engine parts and began orchestrating its exit from the aviation industry altogether. To comply with the duties of a TC holder, Porsche Defendants made no mention of their intentions, nor did they wish to reveal the design defect in the PFM already known to them. Together with Butcher (in the United States), Porsche Defendants went to great lengths assuring all PFM aircraft owners that they would remain loyal to their customers and were committed to honoring their obligations. For example, in a letter to the Mooney Aircraft Pilots Association ("MOPA"), dated May 3, 1995, Butcher stated:

> Last year during the 1994 MOPA convention, more than one owner of a Mooney/Porsche told me of a conversation with Mr. Ken Shoup during which he said that Porsche was going to stop supporting the PFM 3200 aircraft engine…
>
> It is my concern that this situation be rectified. The fact is, Porsche **WILL** continue to support the PFM 3200 engine as they have done in the past. Even though the engine is no longer in production, Porsche has made arrangements for all necessary spare parts including complete engines, should one be required. I personally insure that Porsche Aviation Products maintains $150,000 + in spare parts here in the United States. That's over $6,000 of spare parts per engine

just here in the U.S.

49. To the disappointment of Plaintiffs, the "rumors" proved to be true. Porsche Defendants would soon announce they no longer would manufacture replacement parts. Regrettably, it took an increasing and disproportionate number of recorded incidents involving or indicating risk of in-flight engine failures, before Porsche Defendants publicly announced its exit strategy — an exit strategy that hid the truth as to why Porsche was getting out of the Aviation business.

50. On October 8, 1998, the LBA issued an Airworthiness Directive ("AD"), warning owners of aircraft fitted with PFM engines (N01, N02 and N03 versions) of a hazardous flying condition, which was a result of faulty valve springs. (A true and correct copy is attached and hereinafter referenced as "Exhibit B") Eleven days later, the Australian Civil Aviation Safety Authority ("CASA") issued an identical AD, followed by the FAA on April 12, 1999. (True and correct copies are attached and hereinafter referenced as "Exhibit C" and "Exhibit D.") The FAA however, pointed to six reports of undetected valve spring fatigue failures, with one resulting in an emergency landing.

51. An AD is essentially an emergency public notification by a civil aviation authority to aircraft owners or operators that: (a) an unsafe condition in the product; and (b) the condition is likely to exist or develop in other products of the same type design. AD's are typically mandatory and often compels the respective TC holder to "fix" whatever is causing the unsafe flight condition. Frequently, an AD is issued by an aviation authority at the request of the TC holder, as is required when an unsafe flight condition develops of which the TC holder becomes aware. In such instances, the TC holder issues a Service Bulletin

reiterating the AD, and implements necessary and remedial procedures for aircraft owners and operators to follow.

52.     As a result of "fatigue cracking," the October 8, 1998 AD ordered all aircraft with PFM engines containing cylinder heads with greater than "500 time since new" ("TSN") operating hours, to replace the valve springs before the aircraft can be returned to service. If the cylinder heads had less than 500 TSN, the aircraft would be allowed to remain in service, and did not require replacement valve springs until the 500 TSN was reached. The AD also added, "[t]he exchange of the affected valve springs can only be carried out by personnel authorized by Porsche Company."

53.     The ramifications of this AD were not fully appreciated, and not until recently, even discoverable. The concurrent Service Bulletin issued by Porsche Defendants conspicuously stated:

> If the hours of operation of the cylinder heads and valve springs have exceeded 500 hours of operation, the valve springs will be replaced immediately. **At this time, the available replacement valve springs will be of the old design**.

> At this time a new valve spring assembly is being developed by Porsche. **When the new design valve spring becomes available, Porsche will be installing it on all PFM engines**.

(A true and correct copy of Service Bulletin No. N/105-036 is attached and hereinafter referenced as "Exhibit E.") Evidently, the AD and Service Bulletin established the existence of the design defect in the PFM engine. This design defect was substantial enough to necessitate immediate action, and effectively altered certain specifications for which this TC was certified. Specifically, the PFM engine's maintenance manual (and the warranty

program) specified that "cylinder heads, pistons and cylinders must be inspected at 1000 hours of operation." (*See* Exhibit A, page 7) The AD and Service Bulletin's departure from Porsche Defendants' own prescribed maintenance guidelines was a clear indicator of the design defect in the PFM engine. The remedial procedures set forth in the Service Bulletin serve as undisputed evidence of Porsche Defendants' awareness of this serious "complication." Furthermore, Porsche Defendants used the Service Bulletin as a means to notify PFM aircraft owners and operators that PAG was working to modify the valve spring's design, consistent with its duty as TC holder.

### E.  Fraud at its Worst: Defendants Conceal the PFM Engine's Defective Design.

54.     However, back in Stuttgart, these AD's were not viewed as an opportunity to perfect the PFM engine, but instead as the ultimate motivation for Porsche Defendants to conclude its involvement in the PFM program. Evidently, the burden associated with the PFM engine and its corresponding warranty program was no longer a commitment PAG was willing to honor. Unfortunately, the timing of this decision indicated a complete disregard for the well-being and safety of consumers that remained loyal to a product that had "no substitute."

55.     Knowledge of the product defect went up the chain of command, coming to the attention of PAG's own board of governance. Not long after Porsche-powered aircraft made its debut, it was abundantly clear that PAG was too quick to inject its product into the stream of commerce. Similar to any technologically advanced piece of machinery, the PFM engine had devastating complications that went overlooked or were ignored at its initial stages of research and development. Knowledge of this defect was not enough to deter PAG

from meeting its contract obligation to the respective aircraft manufacturers. Industry standards dictate that (especially when duty-bound) manufacturers such as PAG, must take affirmative steps to cure any defect, and repeat this preventative exercise until the conclusion of the product's natural life. In fact, a number of PFM engineers in PAG's factory in Stuttgart recognized the ramifications of neglecting its TC duty when refusing to cure a number of product defects in the PFM program at its inception, including those involving the valve guide and valve spring. Accordingly, certain executives at PAG, including the Managing Director of Aviation, Rolf Sprenger ("Sprenger") and Wolfgang Streufert ("Streufert"), the Assistant Managing Director of Aviation, were repeatedly notified and warned that ignoring the situation could lead to dire consequences. Regrettably, PAG elected to pursue a cost-effective route, instead of honoring its existing obligations or prior representations thereby putting it customers and their aircraft at risk.

**F.     Porsche Defendants "Take the Road Less Traveled".**

56.     Plaintiffs PFM Air, Goedicke, Collinson, AB Consulting and Williams are owners/assignees of legal claims connected to PFM aircraft purchased prior to the Porsche Defendants' public announcement that they would cease PFM engine part production and maintenance. However Plaintiffs' aircraft were purchased based on the expectation that Porsche Defendants' representations would be honored. Such representations were made via general advertisements, and express warranties made both orally and in writing. Such representations attested to the PFM engine's quality of performance and Porsche Defendants' commitment to ongoing support of the PFM engine. For example, one Porsche Defendants' advertisement read in part:

Because the PFM 3200 has been designed the way Porsche aircraft engines have always been designed. With two things in mind. The pilots. And the aircraft they'll be flying.

A factor of vital importance for the future is Porsche's policy of ongoing PFM engine development to maintain its technological lead. A policy with a long and enduring history that began with Dr. Ferdinand Porsche's first aircraft engine designs in 1909.

\* \* \* \* \*

[The PFM 3200 is] the first Porsche engine we've designed since1911 that's been deemed worthy of carrying on the Porsche tradition.

57. Shortly after the October 8, 1998 AD was issued, Porsche Defendants began to notify all PFM airplane owners of their intent to cease all production of replacement engine parts and discontinue support for any PFM engine ("Notice of Intent"). To no surprise, this decision resulted in an outcry among owners of Mooney PFM, Robin PFM and Cessna PFM owners alike. Without the necessary parts, it would be considerably more difficult to maintain their respective airplane's airworthy condition by FAA standards and eventually would lead to the aircraft being prohibited from flying. Only in future years did it become even more apparent that the faulty valve spring was not the only factor Porsche Defendants took into consideration when deciding to withdraw from the PFM program.

58. The fatigue cracking observed in the valve springs was evidently connected to overheating of the PFM engine, and mostly attributed to PAG's chosen metal composition of certain portions of its cylinders, including the valve guides that were mounted in the cylinder heads. These engine components contained a high content of aluminum, a metal known for its elevated level of conductivity. Particularly in the context of air cooled engines, such

levels of conductivity translate to a potential overheating effect. In one effort to avoid this inevitable result, Porsche Defendants coated the inner lining of the cylinders barrels with a nickel-silicon carbide, known as "Nikasil". This coating insured better lubrication and protected the cylinder bore from overheating, which can often cause fatigue cracking of local reciprocating engine components.

59.     According to the PFM engine's operating manual, the PFM engine must only be run on a designated aviation fuel called Avgas 100LL (a low-leaded automotive fuel is permitted for the N01 version). Relatively low in lead content, Avgas does not have a uniformly regulated limit as to its sulfur content. Although, Nikasil has been a successful tool used to extend cylinders' longevity, it has been known to deteriorate rapidly when exposed to certain levels of sulfur, thereby allowing for increased friction related "wear and tear" of aluminum parts.

60.     Moreover, and perhaps most importantly, bronze and steel are the most commonly used metals in valve guides. These metals are known to create a balance between stiffness and wear on the valve, which is essential in reciprocating engines. Porsche Defendants, for reasons unknown, installed valve guides made of aluminum alloys. Such valve guides are not suitable for use in aviation engines, as their composition causes the entire valve to burn up. For example, the valve guides, in the context of automobiles, were intended for "stop and go" driving at varying levels of RPM. Installed in an airplane, these metallic components are exposed to extreme levels of output (5000 RPM) for extended periods of time – **causing the valves to ignite.**

61.     The resulting elevation in heat also leads to abrasion between the piston and

valve stems, and loads the oil filter with metallic particles. The resulting elevated metallic content, coupled with the PFM engine's high output, results in a dangerous decrease in oil pressure and lubrication. Because air-cooled power plants utilize engine oil as a means of dissipating heat (air-cooling effect), inadequate oil pressure inevitably leads to the overheating of virtually all vital engine components, including valve springs. Accordingly, a vicious cycle of engine degeneration developed. Engine abrasion led to decreased oil pressure, which in turn, led to greater abrasion of engine parts, which caused greater over-heating – all warning signs of a rapidly approaching engine failure.

62. Recognizing the lofty price tag associated with research and development, Porsche Defendants elected to abandon the PFM program, fraudulently concealing the existence of certain design defects. Porsche Defendants were fully apprised of the worsening situation, as there were Porsche-certified mechanics continuously conveying data evidencing these defects, via work orders, or by other means. PAG's own engineers even brought this serious matter to Porsche Defendants' attention, even back when the PFM just entered the stream of commerce. Apparently, the value of human life and danger to the public was not worth the monetary costs associated with the recall of these PFM engines. Unbelievably, Porsche Defendants' chief concern was making a profit, and such recall would tarnish its reputation for "reliability" and "technical superiority" — not to protect its customers, the public, and the aircraft — so they willfully and unlawfully concealed this defect..

63. To no surprise, the PFM engine continued to show signs of design error. For example, on February 6, 2003, the LBA issued yet another AD requiring mandatory inspections of drive shaft teeth due to corrosion of the gear wheels (CASA issued a similar

AD four months later). Consistent with an earlier Service Bulletin, this AD went on to warn, "pitting of the gear teeth can lead to failure of the gear wheel and subsequent failure of the engine." Not long ago, the FAA took notice of this exact same safety risk when it issued a Special Airworthiness Information Bulletin on June 6, 2006, stating corrosion and pitting on the gear wheel and drive shaft can result in mid-flight engine shutdown. The gearbox, similar to the valve springs, was not properly designed by PAG at the initial stages of the PFM engine's production.

64.     Immediately after the issuance of the Notice of Intent, PFM airplane owners worldwide voiced their concerns. Porsche Defendants' responded with correspondence from Springer and Streufert, which said in part:

> We regret any inconvenience this will cause, but Dr.Ing.hc.F.Porsche A.G. can no longer sustain the infrastructure required by the aeronautical industry.

> We still think about solutions for conversion of the engine or recommendation of specialized companies who will offer this. Of course it will be difficult and could be very costly to convert to another engine.

65.     Butcher's responses were much more flagrant, falsely assuring Mooney PFM airplane owners of a future solution. Regrettably, any such attempts to effectuate an engine conversion were made in bad faith and were merely part and parcel of Porsche Defendants' hidden agenda to remove the PFM engine from "the air," without drawing attention to their underlying ulterior motives. To facilitate this plan, Defendants conspired with each other, and their agents, to restrain the supply and artificially drive up prices for PFM engine replacement parts making them too expensive to purchase and maintain. This unlawful

scheme is evidenced by certain email correspondence between Defendants and owners of

PFM aircraft. A few statements made by Porsche Defendants read:

> [T]his is what I have been told to do. Not to [sell] any parts
> in bulk and only when parts are needed. The Germans, do not
> want any extra parts out there floating around. So I am forced
> to [sell] only those parts when needed. Not for future use.
> Hope that helps and I would suggest you keep the lines of
> communication open with Dr. Lindheim. It could not hurt.

* * * * *

> I am sorry but, you got the best of the stock that I had (as for
> alternators I only had two) The Germans were here looking
> over my shoulder while I was preparing your order. And, as
> soon as your parts were shipped the remainder of my parts
> were destroyed. I hope you don't think that negotiating with
> the Germans will get far they are serious and will bow out.

66.     In an effort to facilitate Porsche Defendants' fraudulent and unlawful

concealment of the PFM engine's design defect, Butcher was instructed to "assist" in any

way possible, including purposefully and/or knowingly manipulating certain facets of

Mooney PFM aircrafts' scheduled maintenance, in such a manner which accelerated the

deterioration of the engine, rendering it incapable of overhaul and ultimately unfixable.

67.     It is common knowledge that decreased oil pressure in PFM engines (similar

to 911 automotive engines) can also be directly attributed to burnt valves. Such valves

typically contain a pie-shaped notch burned on the valve itself, and are generally identified

when the engine functions erratically at idle or lower speeds. However, burnt valves are also

associated with improper valve adjustment by Porsche certified engine mechanics, such as

Butcher. Regrettably, and to the utter shock of certain Mooney PFM aircraft owners, Butcher

commenced a practice of purposeful and malicious adjustment of such valves for the sole

purpose of triggering the overheating of the PFM engines. This same overheating was what caused mid-flight engine failures. The reality of Porsche Defendants' unlawful actions, have been confirmed, on at least one occasion, by log book entries coupled with forensic analyses of certain damaged PFM engines. All of Butcher's actions were ordered and/or ratified by Porsche Defendants.

68.     Furthermore, in addition to all Defendants ignoring their duty to warn, Porsche Defendants had knowledge of the valve guide's design defect well before the PFM engine was ever installed in any aircraft. Unwilling to spend more money on development and facing potential bankruptcy, Porsche Defendants kept this important detail hidden from the public. Only now is it evident that the warranty program, which appeared to generously accommodate owners, was just a vehicle by which Porsche Defendants could monitor the condition of their engines. To no surprise, Butcher and other representatives of Porsche Defendants were kept very busy.

69.     During this time, Porsche Defendants also engaged in an illegal plan to discourage respective owners of PFM aircraft from purchasing replacement parts (and booking hefty sales revenue at the same time) which is most obvious from reviewing Porsche Defendants' own purchase invoices. For example, a spark plug that was once priced at approximately $30 in 1999 was sold for $110 in 2002, and then for $284 in 2005. By virtue of holding the TC for the PFM engine, PAG, in concert with PCNA and PAPI and/or their agents, exercised exclusive control over virtually the entire supply of engine replacement parts. Curiously, up through and until Porsche Defendants' exit from the PFM program, all PFM engine replacement parts were manufactured and/or stored in the United States. As

such, parts were at all times in the custody and control of Defendants PCNA and PAPI, despite PAG being headquartered in Stuttgart. However, in an effort to remove all evidence of their defective engine, Porsche Defendants publicly destroyed their entire supply of PFM engines and replacement parts on precisely the same day they discontinued aviation-related activities, leaving little or no evidence in their possession.

G.    **Defendants' Self-Serving and Short-lived Attempt to Remedy the Situation.**

70.    Shortly after the Notice of Intent, Porsche Defendants began accepting bids from third parties, for the purpose of effectuating the engine conversion of the PFM engine. An engine conversion is essentially the process by which the original engine is removed and replaced with another engine compatible with the original airframe. Similar to the TC application process, someone intending to make modifications to the original aircraft is required to submit an application to an aviation authority, such as the FAA, for approval of the new engine's design. This approval comes in the form of a Supplemental Type Certificate ("STC"). Much like a TC, an STC becomes the proprietary property of the applicant upon approval from the aviation authority. Also similar to the TC, an STC cannot be replicated without the holder's written consent and notification sent to the respective aviation authority. Porsche Defendants intended to transfer all of its liabilities and or responsibilities as a TC holder to a third party by the consequent removal of PFM engines from their respective aircraft.

71.    One such "applicant" to convert the aircraft, with regard to Mooney PFM's, was the Florida based company, Mod Works, Inc. ("Mod Works"), whose headquarters was in Punta Gorda, Florida. Aware that being an STC for the Mooney M20L engine conversion

was a lucrative investment, Mod Works significantly underbid other competitors for such work. Although common within the aviation industry, STC's are generally obtained as independent business ventures, commonly without much interaction with the TC holder. Curiously, Porsche Defendants elected to solicit bids and finance the STC and the corresponding engine conversion, rather than amending its own current TC or transferring it to somebody willing to step into its shoes, and fulfill all necessary obligations. Concealing the problems with the PFM had become Porsche Defendants' primary objective, as this was the ultimate opportunity to rid themselves of the PFM engine's liability.

72.     Internal documents serve as evidence of Porsche Defendants' fear that the devastating product liability they were trying so hard to conceal would come to light. To no surprise, Mod Works had full knowledge of Porsche Defendants' underlying intentions regarding the engine conversion. In fact, Mod Works fully acknowledged the potential ramifications of Porsche Defendants' planned withdrawal from the PFM program, as evidenced by internal documents stating in part:

> We understand Porsche's desire to have all the engines removed and returned to the factory. The program goal is to replace all the Porsche engines over a three year period while maintaining a very positive image in the public's view.

> The cost of supporting [the PFM] with such a small volume is high and lacks economic viability. **The burden of product liability must also be considered as a reoccurring cost**.

> \* \* \* \* \*

> One simple solution to retire the fleet would be to make engine parts unavailable forcing the aircraft to be removed from service. This however would create a negative image and have an adverse effect on the owners of these products.

* * * * *

>Porsche and Mod Works would share development costs and
marketing program execution.

73.     Sadly enough, Porsche Defendants were walking a fine line between

protecting its "public image" and protecting the public and its plane owners.  To that end, in

the year 2001, Porsche Defendants notified PFM aircraft owners worldwide that they had

obtained a suitable (and attractive) alternative to its PFM engine.  Porsche Defendants

informed customers that third parties had been retained to replace all PFM engines with

Continental and Lycoming engines, in the American and European Fleets respectively.

74.     PAG represented that they fully endorsed this remedial measure, as

demonstrated by the following statements to Mooney PFM owners via written

correspondence from Sprenger and Streutfort:

>[I]n the meantime in co-operation with our subsidiary,
Porsche of North America, and a licensed aircraft service
company in the USA we have worked out a solution for the
reconstruction [of] the engine.

>The Porsche A.G., [and] respectively our subsidiary Porsche
of North America will financially support this project.

>I have informed Mr. Coons, Mod Works, Florida, USA about
our telephone conversations also Gary Butcher and Dr.
Lindheim (Porsche of North America).  You will receive an
offer of conversion as well as for the sale of your Mooney
aircraft.

75.     The PFM engine conversion was made public through a   number

advertisements, identifying Sprenger, Streufert and Butcher as "team members,"

guaranteeing "expert consulting and customer service" with regard to the conversion process.

(*See* corresponding portion of Mod Works' brochure, attached and hereinafter referenced as "Exhibit F.") In addition to funding all research and development associated with obtaining the STC, Porsche Defendants exercised complete control over virtually all other aspects of the project, including but not limited to its marketing campaign. Mod Works was effectively prohibited from distributing a single piece of literature regarding the PFM conversion, without Porsche Defendants' prior approval.

76.     Offering a contribution of up to $60,000 (the current PFM engine replacement cost), Porsche Defendants went on a crusade to reclaim all the PFM engines, while misrepresenting crucial facts to aircraft owners and concealing the dangers associated with the PFM engine's design defects. The Mooney PFM engine conversions were to be all accomplished in the State of Florida, with Butcher personally spending considerable time at Mod Works' headquarters, located in Punta Gorda, Florida, coordinating drop-off dates the for respective aircraft. During January of 2002, virtually all Mooney PFM owners received a letter/contract ("Conversion Offer" or "Offer"), sent from Mod Works' headquarters in Florida, which provided, in part:

> [a]s you are aware, Porsche A.G. recently announced that beginning July 31, 2005, it will no longer support the PFM 3200 engine. In light of that fact, Mod Works has developed a program whereby you can maximize your aircraft value and at the same time enjoy the continued use of your aircraft once support ends...
>
> Options A and B require FAA certification (Supplemental Type Certificates, Parts Manufacturing Approval, Form 337 Major Modification and Return to Service Endorsement) which Mod Works will obtain. The certification process will require significant preliminary testing and evaluation. Although the testing costs are included in the prices quoted

below, Mod Works intends to initially finance the certification costs through bank loans and the purchase of your PFM 3200 [ ] aircraft engine and resale to Porsche A.G. To obtain bank financing, Mod Works needs your binding commitment to purchase one of the listed services…

You acknowledge that Mod Works' ability to provide the services described in Options A, B and C is conditioned on Mod Works obtaining financing and the necessary FAA certifications. Mod Works warrants that it will use its commercially reasonable best efforts to obtain financing and FAA certifications. **If, however, Mod Works after making the required effort is unable to fulfill either of these conditions by March 30, 2003, this Agreement will automatically terminate.**

77.     The Conversion Offer included information detailing the many benefits available to owners of Mooney PFM aircraft. Specifically, it represented that all converted aircraft would have a fair market value of $229,000 - $310,000 and increase performance. (*See* corresponding portion of the Mod Works brochure, attached and hereinafter referenced as "Exhibit G.") Porsche Defendants were actively involved in persuading Mooney PFM owners that the conversion would add value to the aircraft. Accordingly, owners of Mooney PFM aircraft, relying on representations made by all Defendants, accepted the Offer and sent in the requisite $1,000 deposit. It is important to note that the STC was initially conferred by the FAA on June 20, 2003 – nine months after the contractually prescribed deadline. (A true and correct copy of the FAA's acceptance letter is attached and hereinafter referenced as "Exhibit H") Accordingly, the letter/contract never had any force and effect.

78.     Furthermore, through its employee Butcher, Porsche Defendants were able to convince prospective customers to purchase Mooney PFM aircraft, based on the same promises made to existing owners. Pacific Aeromarine, Hoffman and Johnson were

purchasers that relied on Defendants' representations that the Mooney PFM aircraft was an investment, whose value was destined to increase in value, specifically upon completion of the engine conversion. Despite full knowledge of the dangers associated with the PFM engine's design defects, Porsche Defendants continued to advertise the Mooney PFM as a reliable product, suited for its intended use. It was no coincidence that *Private Pilot* ran an article in January of 2003, praising the Mooney PFM aircraft and the engine manufacturer. In the article, statements were made such as:

> Mooney and Porsche have stood **behind their mutual product**, and no expensive surprises resulted from having an unusual power plant. The original two-blade prop caused some vibration problems with a few planes. Porsche identified the problem and covered all the costs of a new three-blade prop, except the $60 installation fee, even though the problem was outside the warranty plan.

* * * * *

> Once again, Porsche **didn't let customers down**. Every owner of an M20L was offered the choice of having Porsche outright buy the airplanes back or accepting an allowance toward the installation of a new Continental [engine] in their plane.

79. Accordingly, Pacific Aeromarine, Hoffman and Johnson were induced into the purchase of their Mooney PFM aircraft based on Defendants' representations that when converted, the aircraft would perform better than before and have a greater resale value. These PFM owners were contacted by Porsche Defendants, through Butcher directly, who had learned of their interest in purchasing an aircraft. Butcher explained that Mod Works was working with Porsche Defendants to substitute the PFM engine with the Continental. He additionally represented that the conversion would result in a higher level of performance

and an increased resale value – representations not unlike those made to all other Mooney PFM owners. Butcher made assurances that Porsche Defendants would continue to manufacture replacement engine parts up until Mod Works completed conversions on the entire fleet of Mooney PFM aircraft; a conversion program that was never completed.

80. Mooney PFM aircraft owners were repeatedly reminded of their rights under the ongoing Porsche warranty program, as was evident from the many letters Mod Works sent to PFM Mooney owners including Plaintiffs. One such letter stated, "The Mod Works team is looking forward to working on [the Mooney PFM aircraft] to accomplish your engine exchange under the **Porsche warranty program**." Another letter stated, "Mod Works must have your airplane on our ramp for the engine exchange under the **Porsche warranty program** no later than July 30, 2004." At all times relevant, Mod Works acted as an agent of Porsche Defendants, with their authority, knowledge and/or consent.

81. However, only a few conversions having been completed, Hurricane Charley hit the Florida coastline in August of 2004, destroying Mod Works' facilities and effectively terminating its involvement in the PFM engine conversion program. Subsequent to the hurricane, Dennis Bernhard ("Bernhard") at Lone Star Aero ("Lone Star") was requested by Mod Works, Butcher and Porsche Defendants, to complete a handful of conversions. Located in San Antonio, Lone Star converted a number of aircrafts, including Pacific Aeromarine's right after Mod Works dissolved its corporate status on September 16, 2005. Moreover, it soon became evident that, irrespective of Defendants' representations, the PFM conversion was defective on its face, resulting in an airplane with little or no resale value. For example, the useful load in the converted aircraft ("Mooney TCM") was entirely

inconsistent with its purported specifications (The useful load is calculated by subtracting the empty weight of an aircraft from its maximum gross weight). Advertisements sent from Mod Works' headquarters, and approved by Porsche Defendants, represented that the converted Mooney TCM would have a useful load of 1143lbs., the same as the Mooney Ovation. However, unforeseen complications with regard to Mod Works' assessment of the TCM's conversion making the resulting aircraft heavier than expected. This translated to a useful load of approximately 645lbs, which is not only drastically less than advertised, but essentially limits the use of the aircraft to just the pilot. (The FAA has only certified this conversion for a useful load of 897lbs; therefore, in order to fly the aircraft, a pilot is now forced to decrease the fuel supply and any other weight on board, eliminating the possibility of flying with passengers and rendering the other three (3) seats useless.) This flaw is not specific to any one converted airplane, but reflects the TCM conversion in its entirety. Because they were financing the conversion program, Porsche Defendants along with their employee Butcher, were fully informed as to the weight specifications included in Mod Works' STC application to the FAA. They also recognized that the converted Mooney TCM had an increased weight by approximately 468 lbs. Evidently, Porsche Defendants had no interest in "providing a solution" to owners of Mooney PFM aircraft. After the hurricane, it was evident that Mod Works was unable to resume operations. Porsche Defendants could have reassigned the PFM engine conversion project to another party. The successful conversion of all Mooney PFM aircraft would have effectively shifted liability from the TC holder, to the STC holder. In fact, Porsche Defendants did discuss the possibility of this goal with Bernhard, as evidenced by an email dated March 21, 2005, from Ivana Strickland,

Executive Assistant to the CFO, which read:

> Dear Mr. Bernhard,
>
> Dr. Wolfgang Lindheim, the Executive Vice President and the CFO of Porsche Cars North America Inc. would like to meet with you at your location in San Antonio and discuss the status of the repairs and the next steps regarding potential future repairs of the planes with the Porsche engines.
>
> Could you kindly let me know of you will be available to meet with Dr. Lindheim on Thursday, March 24[th]?

82.     Evidently, Porsche Defendants realized that the STC opened them up to new liabilities, and calculated that taking no action would be more "cost-effective" than fulfilling its obligations to Mooney PFM owners

83.     Overseas, Porsche Defendants were more successful in their efforts to convert the Porsche-powered aircraft. The Lycoming IO-320 was the engine picked to replace version N01. Although Porsche Defendants were successful in convincing approximately two-thirds of Robin PFM owners to convert their engines, the remaining owners (including the two Cessna aircraft) remained resolute. They purposely purchased a Robin PFM because the engine powering the aircraft happened to be a "Porsche." Consistent with the viewpoint taken in the United States, Porsche Defendants were unwilling to disclose the true rationale for discontinuing aviation-related activities.

84.     Until recently, the owners of all PFM aircraft have been uninformed as to the design defects associated with their engines. Ever since the Notice of Intent, owners of these aircraft have made repeated requests for PAG to allow them access to the PFM engine's technical data, or transfer the TC to someone willing to fulfill the obligations Porsche

35

Defendants have clearly abandoned. The following email, dated May 12, 2005, to a Mooney PFM owner epitomizes Porsche Defendants' position:

> [P]lease excuse the delayed response to your e-mail. We hope the answers below will clarify the current situation with the Porsche airplanes.
>
> 1.     We will continue to sell parts that are in our current inventory till May 31, 2005.
> 2.     Porsche will not provide any technical data for alternative parts manufacturing.
> 3.     There is no Porsche authorized after market supply of parts.
> 4.     The Porsche Aviation N03 engine Type Certificate will not be surrendered.

85.     "Porsche will not surrender its Type Certificate," has consistently been Porsche Defendants' mantra, generally keeping quiet, hoping for any applicable statute of limitations to run and thereby relieving them of liability.

86.     Ironically, in an April 6, 2006 correspondence to a Mooney PFM owner, PCNA's General Counsel, Patricia Britton represented,"(i) Porsche no longer provides spare parts for the Porsche airplane engines; and (ii) Porsche will honor any product liability or airworthiness responsibilities as provided by law." However, despite such admission, it appears Porsche Defendants have purposely neglected their duties as prescribed by aviation laws in Germany and the United States. Rather than fix the defect as promised in their Service Bulletin, Porsche Defendants have concealed it and knowingly put their customers' planes, and more importantly, their lives at risk.

87.     Curiously, it seems Porsche Defendants acknowledge the fact that liabilities remain, as long as PAG retains possession of the Type Certificate. Ironically, and

inconsistent with PCNA's prior position, in an email to a Mooney PFM owner, dated February 11, 2008, Patricia Britton represented:

> As we advised all known owners of aircraft with the PFM 3200 engine in 1999, Porsche no longer has the capability of supporting this engine. Although I understand the enthusiasm you have for the engine, Porsche is not deviating from the plans it outlined to you and other owners more than 8 years ago.
>
> **Porsche is in the process of surrendering the engine type certificate to EASA in Europe**.

88.     True to form, PAG has recently taken affirmative steps to further shield itself from liability and disclaim any future obligations with regard to the PFM Type Certificate. In a bulletin issued by the European Aviation Safety Agency ("EASA"), dated October 26, 2007, PAG "requested to surrender its Type Certificates to EASA." (A true and correct copy of the EASA bulletin is attached and hereinafter referenced as "Exhibit I.") Such maneuvering at this late date is highly suspicious and not well-taken. For over eight years, Porsche Defendants have guarded the technical data surrounding the PFM TC, not wanting their apparent "cover-up" to be exposed. Suddenly, PAG has done a 180, and is now attempting to surrender the TC to the EASA, without the technical data necessary to keep PFM aircraft flying.

89.     Undoubtedly, Porsche Defendants hope, without the necessary technical data, the future successor will be unable to achieve the capabilities to re-engineer and maintain the PFM engine. By withholding the technical data, a former TC holder — here Porsche — makes it difficult and much more expensive to obtain a production certificate. Therefore, it appears Porsche Defendants anticipate: (1) the potential transfer of the TC to an unsuspecting

successor, who will inherit the liability created by PAG; or (2) if no viable transferee comes forward, the EASA will have no choice but to revoke the TC. Generally, in the event of a foreign TC revocation, full faith and credit is conferred by virtue of a bilateral treaty. In short, Porsche Defendants hope their ultimate goal of grounding all PFM aircraft shall be achieved through regulatory action.

**H.** **Reality Sets In: Plaintiffs Were Duped And Suffer The Consequences.**

90.     Because of the conduct described above, owners of PFM aircraft are left with a commercial good with limited or no functional use and virtually zero resale value. To the extent any conversion can be effectuated in the present day, the current Mooney TCM is not a suitable alternative to the Mooney PFM, based on any reasonable expectation or assessment of the aircraft's performance and/or merchantability. Regardless, forcing the conversion of any PFM aircraft (including Robins and Cessnas) does nothing but frustrate Plaintiffs' original intent, as they failed to receive any "benefit of the bargain" when they purchased this "Porsche." Accordingly, as a result of Defendants' unlawful and wrongful conduct, Plaintiffs have suffered damages, *inter alia*, in the form of the substantial or complete devaluation of their aircraft, coupled with substantial or total loss of use, and other compensatory and exemplary damages.

## COUNT I - Fraud (in the Inducement)

91.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 90 as if fully stated herein.

92.     The Porsche Defendants made representations concerning material facts that they knew or reasonably should have known were false, or they made such representations with reckless disregard for the truth.

93.     These representations include, but are not limited to:

i.      Representations that the PFM engine was safe and reliable;

ii.     Representations that Porsche Defendants stood behind their product;

iii.    Representations that the PFM engine would perform consistent with its intended use;

iv.     Representations that Porsche Defendants were committed to the ongoing support of the PFM engine;

v.      Representations that Porsche Defendants would honor its warranty program;

vi.     Representations that a PFM aircraft was an investment;

vii.    Representations that following the PFM maintenance manual would ensure the longevity of the engine;

viii.   Representations that Porsche Defendants would fix design defects at their own cost;

ix.     Representations that the PFM N01 and N03 would be free of defects in material and workmanship;

x.      Representations that the PFM maintenance manual detailed the proper method to maintain the engine;

xi. Representations that the PFM engine cylinders, cylinder heads and pistons had a lifespan of at least 1000 flight hours;

xii. Representations that only personnel authorized by Porsche Defendants could replace the defective valve springs in the PFM N01 and N03 engines;

xiii. Representations that PAG was developing a valve spring of a new design for the PFM N01 and N03 engine;

xiv. Representations that Porsche Defendant would be installing a valve spring of new design.

xv. Representations that 2000 flight hours was the proper TBO for the PFM N01 and N03 engines;

xvi. Representations that the PFM N01 and N03 engine required a top overhaul when it reached 1000 flight hours;

xvii. Representations that Defendants would perform a top overhaul when the PFM engine reached 1000 flight hours;

xviii. Representations that PAPI would provide purchasers of aircraft with PFM N03 engines a remanufactured engine at a specific price;

xix. Representations that PAPI would provide purchasers or aircraft powered by PFM N03 engines a published guaranteed base price for a new or remanufactured PFM N03 engine;

xx.     Representations that after the sixth year of ownership of an aircraft powered by a PFM N03 engine, PAPI could only change the guarantee base price with forty-eight months prior notice;

xxi.    Representations that the Porsche warranty program was transferable between successive owners;

xxii.   Representations after the Notice of Intent, PAG would not transfer the PFM Type Certificate or its technical data;

xxiii.  Representations after the Notice of Intent that Porsche Defendants were searching for a solution to the PFM dilemma;

xxiv.   Representations that defects associated with the Mooney PFM aircraft's gearbox was a result of improper engine oil;

xxv.    Representations that PAG, as the Type Certificate holder, would notify the proper aviation authority, in the event of an engine defect;

xxvi.   Representations that PAG, as the Type Certificate holder, would monitor and solve any technical defects as they arose;

xxvii.  Representations that PAG would honor all of its other duties as a Type Certificate holder;

xxviii. Representations that Porsche Defendants would provide an inspection and maintenance program for the continued airworthiness of the Mooney PFM aircraft;

xxix.   Representations, after Mod Works was retained to effectuate engine conversions, that Porsche Defendants would continue to provide parts and service for the PFM engines until completion of the conversion program.

xxx.   Representations that Defendants were working with Mod Works to effectuate an engine conversion for the Mooney PFM aircraft;

xxxi.   Representations that Porsche Defendants would finance research and development for the STC Mod Works hoped to obtain;

xxxii.   Representations that Mod Works advertising materials accurately portrayed the TCM conversion;

xxxiii.   Representations that PAG would buy back PFM aircraft if owners were unwilling to convert the engine;

xxxiv.   Representations that the Porsche Defendants would provide a reputable third party to effectuate the conversion of the Mooney PFM;

xxxv.   Representations that the respective engine chosen by Porsche Defendants would provide equal or better performance than the PFM engine;

xxxvi.   Representations that the TCM engine conversion would be successful;

xxxvii. Representations that the TCM engine conversion would secure a greater resale price;

xxxviii. Representations that the TCM engine conversion would add value to the respective aircraft;

xxxix. Representations that the TCM engine conversion was certified by the FAA, consistent with representations and advertisements approved by Porsche Defendants and its employee and representative Butcher;

xl. Representations that the gross weight of the Mooney aircraft after the TCM conversion was 3300 pounds;

xli. Representations that the TCM engine conversion would be done in a timely fashion;

xlii. Representations that Porsche Defendants were discussing the continuation of the engine conversion after Mod Works was destroyed by the hurricane;

xliii. Representations that there would be no authorized after-market supply of PFM engine replacement parts after May 31, 2005;

xliv. Representations that Porsche Defendants would continue to honor their airworthiness obligations;

xlv. Representations that Porsche Defendants would continue to honor their product liability obligations;

xlvi.   Representations that Porsche Defendants would not surrender

the PFM TC;

xlvii.   Representations that there is "no substitute" for a Porsche.

94.   These representations were made with the intention to induce Plaintiffs' reliance on them, and Plaintiffs did in fact rely on them to their detriment. Plaintiffs have been injured by Defendants' fraudulent inducement, for which they are entitled to recover.

95.   As a proximate result of Defendants' fraudulent inducement, Plaintiffs have suffered economic and non-economic damages, to themselves and/or their property, for which Plaintiffs are entitled to recover. Plaintiffs also seek to recover consequential and punitive damages, pre- and post-judgment interest, and costs.

96.   The accrual of Plaintiffs' claims, if applicable, was delayed under the Discovery Rule, the Fraudulent Concealment Doctrine and the Continuing Tort Doctrine.

## COUNT TWO - Negligence

97.   Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 90 as if fully stated herein.

98.   Porsche Defendants owed Plaintiffs a legal duty, which includes, but is not limited to:

i.   implementing a safety program, which includes reporting, tracking and resolving any technical issues associated with the airworthiness of a Type Certificate;

ii.   providing Plaintiffs with PFM replacement engines and parts;

iii.    redesigning the defective valve spring and replace it with a "non-defective" version;

iv.    attaining a suitable alternative to the PFM engine which would allow the continued use and enjoyment of Plaintiff's airplanes; and

v.    refraining from any action that would jeopardize Plaintiffs' continued use and enjoyment of their airplane.

99.    Porsche Defendants breached their duty when they:

i.    failed to warn PFM airplane owners of the design defect in the engine;

ii.    failed to redesign the defective valve spring;

iii.    failed to replace the defective valve spring;

iv.    failed to provide product support;

v.    artificially drove up the cost of parts and service;

vi.    ceased production of replacement engine parts;

vii    failed to find a suitable alternative to the PFM engine;

viii.    destroyed their entire supply of PFM replacement engines and parts;

ix.    applied to surrender the PFM engine Type Certificate to the EASA without relinquishing the corresponding technical data.

100.    As a proximate result of the Porsche Defendants' breach of duty, Plaintiffs have suffered damages, including but not limited to, the substantial and/or complete devaluation of their aircraft, for which they are entitled to recover.

101.    The accrual of Plaintiffs' claims, if applicable, was delayed under the Discovery Rule, the Fraudulent Concealment Doctrine and the Continuing Tort Doctrine.

## COUNT THREE – Gross Negligence

102.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 90 as if fully stated herein.

103.    As indicated in Count Two, Porsche Defendants owed Plaintiffs a duty, including, but not limited to:

> i.      implementing a safety program, which includes reporting, tracking and resolving any technical issues associated with the airworthiness of a Type Certificate;
>
> ii.     providing Plaintiffs with PFM replacement engines and parts;
>
> iii.    redesigning the defective valve spring and replace it with a "non-defective" version;
>
> iv.    attaining a suitable alternative to the PFM engine which would allow the continued use and enjoyment of Plaintiff's airplanes; and
>
> v.     refraining from any action that would jeopardize Plaintiffs' continued use and enjoyment of their airplane.

104.    At all times relevant, Porsche Defendants acted with needless, reckless and intentional disregard for the safety of the Plaintiffs.

105.     As a result of Porsche Defendants' breach of duty, which amounted to conscious indifference for the welfare and safety of PFM aircraft owners or the general public, Plaintiffs have suffered economic and non-economic damages, to themselves and/or their property, for which Plaintiffs are entitled to recover.  Plaintiffs also seek to recover consequential and punitive damages, pre- and post-judgment interest, and costs.

106.     The accrual of Plaintiffs' claims, if applicable, was delayed under the Discovery Rule, the Fraudulent Concealment Doctrine and the Continuing Tort Doctrine.

### COUNT FOUR – Misrepresentation

107.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 90 as if fully stated herein.

108.     Porsche Defendants and Butcher owed Plaintiffs a legal duty of care in the representations made and relied upon by owners and prospective purchasers of aircraft powered with PFM N01 and N03 engines.  These representations include, but are not limited to:

> i.          Representations that the PFM engine was safe and reliable;

> ii.          Representations that Porsche Defendants stood behind their product;

> iii.          Representations that the PFM engine would perform consistent with its intended use;

> iv.          Representations that Porsche Defendants would honor its warranty program;

47

v.	Representations that Porsche Defendants were committed to the ongoing support of the PFM engine;

vi.	Representations that a PFM aircraft was an investment;

vii.	Representations that following the PFM maintenance manual would ensure the longevity of the engine;

viii.	Representations that Porsche Defendants would fix design defects at their own cost;

ix.	Representations that the PFM N01 and N03 would be free of defects in material and workmanship;

x.	Representations that the PFM maintenance manual detailed the proper method to maintain the engine;

xi.	Representations that the PFM engine cylinders, cylinder heads and pistons had a lifespan of at least 1000 flight hours;

xii.	Representations that only personnel authorized by Porsche Defendants could replace the defective valve springs in the PFM N01 and N03 engines;

xiii.	Representations that PAG was developing a valve spring of a new design for the PFM N01 and N03 engine;

xiv.	Representations that Porsche Defendant would be installing a valve spring of new design.

xv.        Representations that 2000 flight hours was the proper TBO for the PFM N01 and N03 engines;

xvi.        Representations that the PFM N01 and N03 engine required a top overhaul when it reached 1000 flight hours;

xvii.        Representations that Defendants would perform a top overhaul when the PFM engine reached 1000 flight hours;

xviii.        Representations that PAPI would provide purchasers of aircraft with PFM N03 engines a remanufactured engine at a specific price;

xix.        Representations that PAPI would provide purchasers or aircraft powered by PFM N03 engines a published guaranteed base price for a new or remanufactured PFM N03 engine;

xx.        Representations that after the sixth year of ownership of an aircraft powered by a PFM N03 engine, PAPI could only change the guarantee base price with forty-eight months prior notice;

xxi.        Representations that the Porsche warranty program was transferable between successive owners;

xxii.        Representations after the Notice of Intent, PAG would not transfer the PFM Type Certificate or its technical data;

xxiii.        Representations after the Notice of Intent that Porsche Defendants were searching for a solution to the PFM dilemma;

xxiv.        Representations that defects associated with the Mooney PFM aircraft's gearbox was a result of improper engine oil;

xxv.        Representations that PAG, as the Type Certificate holder, would notify the proper aviation authority, in the event of an engine defect;

xxvi.        Representations that PAG, as the Type Certificate holder, would monitor and solve any technical defects as they arose;

xxvii.        Representations that PAG would honor all of its other duties as a Type Certificate holder;

xxviii.        Representations that Porsche Defendants would provide an inspection and maintenance program for the continued airworthiness of the Mooney PFM aircraft;

xxix.        Representations, after Mod Works was retained to effectuate engine conversions, that Porsche Defendants would continue to provide parts and service for the PFM engines until completion of the conversion program;

xxx.        Representations that Defendants were working with Mod Works to effectuate an engine conversion for the Mooney PFM aircraft;

xxxi.        Representations that Porsche Defendants would finance research and development for the STC Mod Works hoped to obtain;

xxxii.        Representations that Mod Works' advertising materials accurately portrayed the TCM conversion;

xxxiii.        Representations that PAG would buy back PFM aircraft if owners were unwilling to convert the engine;

xxxiv.        Representations that the Porsche Defendants would provide a reputable third party to effectuate the conversion of the Mooney PFM;

xxxv.        Representations that the respective engine chosen by Porsche Defendants, would provide equal or better performance than the PFM engine;

xxxvi.        Representations that the TCM engine conversion would be successful;

xxxvii.        Representations that the TCM engine conversion would secure a greater resale price;

xxxviii.        Representations that the TCM engine conversion would add value to the respective aircraft;

xxxix.        Representations that the TCM engine conversion was certified by the FAA, consistent with representations and advertisements approved by Porsche Defendants, and their employee and representative Butcher;

xl.        Representations that the gross weight of the Mooney aircraft after the TCM conversion was 3300 pounds;

xli.        Representations that the TCM engine conversion would be done in a timely fashion;

xlii.        Representations that Porsche Defendants were discussing the continuation of the engine conversion after Mod Works was destroyed by the hurricane;

xliii.        Representations that there would be no authorized after-market supply of PFM engine replacement parts after May 31, 2005;

xliv.        Representations that Porsche Defendants would continue to honor their airworthiness obligations;

xlv.        Representations that Porsche Defendants would continue to honor their product liability obligations;

xlvi.        Representations that Porsche Defendants would not surrender the PFM TC;

xlvii.        Representations that "there is no substitute" for a Porsche.

109.    Porsche Defendants breached their duties when they, *inter alia*:

i.        failed to warn PFM airplane owners of the design defect in the engine;

ii.        failed to redesign the defective valve spring;

iii.        failed to replace the defective valve spring;

iv.        failed to provide product support;

v.      ceased production of replacement engine parts;

vi      failed to find a suitable alternative to the PFM engine;

vii.      destroyed their entire supply of PFM replacement engines and parts;

viii.      applied to surrender the PFM engine Type Certificate to the EASA without relinquishing the corresponding technical data.

110.    Plaintiffs justifiably relied upon the misrepresentations and suffered economic and non-economic injuries as a result.

111.    As a proximate result of the misrepresentations made by Defendants, Plaintiffs have suffered economic and non-economic damages, to themselves and/or their property, for which Plaintiffs are entitled to recover. Plaintiffs also seek to recover consequential and punitive damages, pre- and post-judgment interest, and costs.

112.    The accrual of Plaintiff's claims, if applicable, was delayed under the Discovery Rule, the Fraudulent Concealment Doctrine and the Continuing Tort Doctrine.

## COUNT FIVE - Breach of Express Warranty

113.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 90 as if fully stated herein.

114.    The advertisements, verbal statements and other similar uniform representations disseminated by Porsche Defendants regarding the performance and quality of the PFM engine. These advertisements, verbal statements and other similar uniform representations, formed, in whole or in part, the basis of the bargain between Plaintiffs and Porsche Defendants, and constituted express warranties that the PFM engines would conform

thereto. As described above, the PFM engines owned by Plaintiffs did not conform to these warranties and representations.

115.    Porsche Defendants provided warranties to Plaintiffs which they breached and failed to honor. The time limitations set forth in those warranties provide that PFM engines owned by Plaintiffs should still be covered by Porsche Defendants. Among other things, the Notice of Intent demonstrated that Plaintiffs had no meaningful choice in determining time limitations in the warranty; terms that unreasonably favored Porsche Defendants by virtue of the Notice of Intent and evidence the gross disparity on bargaining power, particularly in light of Porsche Defendants' knowledge of design defect and imminent engine failure.

116.    Plaintiffs were involved in the purchase of aircraft powered by PFM N01 and N03 engines, and purchased engine replacement parts directly or indirectly from Porsche Defendants.

117.    Porsche Defendants provided express warranties in connection with the sale and airworthiness of these PFM aircraft and engine replacement parts. All such warranties were comprised of representations made orally or in written form. These representations and warranties included:

       i.      that the PFM N01 and N03 engines would be free from defects in material and workmanship appearing within certain prescribed periods of time;

      ii.      that PFM N01 and N03 engines had a TBO of 2000 flight hours;

iii.     that PAPI would provide a new or remanufactured PFM engine ("Engine Exchange") to purchasers of aircraft powered with N03 engines, contingent upon the aircraft attaining its applicable TBO;

iv.     that the Engine Exchange would always be offered at a certain advertised price;

v.     that Butcher and Porsche Defendants would provide all necessary replacement parts and support for PFM N01 and N03 engines;

vi.     that PAG would remanufacture or exchange the PFM N01 and N03 engines when they reached 2000 hours of operation;

vii.     that the cylinder heads, pistons and cylinders has a useful life consistent with what the PFM maintenance manual set forth;

viii.     that PAG were developing a new design for the valve springs and would install them when they became available; and

ix.     that Porsche Defendants would continue providing replacement parts up through and until Mod Works had successfully completed the PFM conversion program.

118.     The express representations and warranties described above, were breached when, among other acts or actions:

i.     Porsche Defendants announced that they would no longer provide service and parts for the PCM engine;

ii.     Porsche Defendants failed to provide necessary replacement PFM replacement engines and parts;

iii.    Porsche Defendants destroyed their entire supply of PFM engine replacement engines and parts;

iv.    Porsche Defendants failed to cure material defects in the PFM N01 and N03 engine;

v.     Porsche Defendants failed to redesign the defective valve springs and install them on the PFM N01 and N03 engines;

vi.    Porsche Defendants failed to provide an alternate third party to effectuate the Mooney PFM engine conversion.

119.    Plaintiffs notified Defendants of the breach of warranty, either verbally or via written correspondence.

120.    The element of privity, if found applicable, exists vis-à-vis Porsche Defendants and Plaintiffs because, *inter alia*: (a) Porsche Defendants have had direct written communications with Plaintiffs regarding the PFM engines in the form of standardized warranty forms, registration cards, and other similar documents; (b) Porsche Defendants have had direct communications with Plaintiffs regarding the PFM engines advertisements and verbal communications; (c) Porsche Defendants have entered into contracts with Plaintiffs in connection with the assurances of these warranties; and (d) Plaintiffs are direct or third party beneficiaries of such warranties.

121.    As a result of Defendants' breach of express warranties, Plaintiffs have suffered economic and non-economic damages, to themselves and/or their property, for

which Plaintiffs are entitled to recover. Plaintiffs also seek to recover consequential and punitive damages, pre- and post-judgment interest, and costs.

122. The accrual of Plaintiffs' claims, if applicable, was delayed under the Discovery Rule, the Fraudulent Concealment Doctrine and the Continuing Tort Doctrine.

## COUNT SIX – Breach of Implied Warranty:
## UCC Article II (Fla. Stat. § 672.314 et seq.)

123. Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 90 as if fully stated herein.

124. Defendant PAG was a manufacturer/merchant of PFM N01 and N03 aircraft engines.

125. Defendant PAG expressly provided for the transferability of its warranty program to successive owners of the PFM N03 engine.

126. Plaintiffs are direct and indirect purchasers of aircraft powered with PFM engines

127. Defendant PAG breached its warranty of merchantability when:

i. it became public knowledge that the PFM N01 and N03 engines contained design defects, which Porsche Defendants claim they had knowledge of and declined to cure;

ii. Porsche Defendants refused to honor the PFM engine warranty program;

iii. PAG discontinued its search for an alternative STC vendor, to convert the Mooney PFM aircraft; and

iv. PAG publicly applied for the surrender of the PFM engine Type Certificate to the EASA.

128. Plaintiffs, had they known the true facts, would not have purchased their PFM aircraft or paid as much as they did.

129. The element of privity, if found applicable, exists vis-à-vis Porsche Defendants and Plaintiffs because, *inter alia*: (a) Porsche Defendants have had direct written communications with Plaintiffs regarding the PFM engines in the form of standardized warranty forms, registration cards, and other similar documents; (b) Porsche Defendants have had direct communications with Plaintiffs regarding the PFM engines advertisements and verbal communications; (c) Porsche Defendants have entered into contracts with Plaintiffs in connection with the assurances of these warranties; and (d) Plaintiffs are direct or third party beneficiaries of such warranties.

130. Plaintiffs notified Defendants of the breach of warranty, either verbally or via written correspondence.

131. As a result of Defendants' knowing and/or intentional breach of merchantability, Plaintiffs have suffered injuries to their property in the form of a complete or substantial loss of value in their aircraft.

132. The accrual of Plaintiff's claims, if applicable, was delayed under the Discovery Rule, the Fraudulent Concealment Doctrine and the Continuing Tort Doctrine.

## COUNT SEVEN – Florida Deceptive and Unfair Trade Practices Act
### (Fla. Stat § 501.201 et seq.)

133.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 90 as if fully stated herein.

134.    Porsche Defendants were involved in deceptive acts and unfair practices in the sale of the Mooney PFM and/or the Mooney TCM aircraft and breached warranties, both express and implied when:

  i. it became public knowledge that the PFM N01 and N03 engines contained design defects, which Porsche Defendants declined to cure;

  ii. Porsche Defendants refused to honor the PFM engine warranty program;

  iii. PAG discontinued its search for an alternative STC vendor to convert the Mooney PFM aircraft; and

  iv. PAG publicly applied for the surrender of the PFM engine Type Certificate to the EASA.

135.    Plaintiffs, had they known the true facts, would not have purchased their PFM aircraft or paid as much as they did.

136.    The element of privity, if found applicable, exists vis-à-vis Porsche Defendants and Plaintiffs because, *inter alia*: (a) Porsche Defendants have had direct written communications with Plaintiffs regarding the PFM engines in the form of standardized warranty forms, registration cards, and other similar documents; (b) Porsche Defendants have

had direct communications with Plaintiffs regarding the PFM engines advertisements and verbal communications; (c) Porsche Defendants entered into contracts with Plaintiffs in connection with the assurances of these warranties; and (d) Plaintiffs are direct or third party beneficiaries of such warranties.

137. Plaintiffs notified Defendants of the breach of warranty claims, either verbally or via written correspondence.

138. As a result of Defendants' knowing and/or intentional deceptive acts and unfair practices, Plaintiffs have suffered economic and non-economic damages, to themselves and/or their property, for which Plaintiffs are entitled to recover. Plaintiffs also seek to recover actual damages, attorneys' fees and costs.

139. The accrual of Plaintiff's claims, if applicable, was delayed under the Discovery Rule, the Fraudulent Concealment Doctrine and the Continuing Tort Doctrine.

## COUNT EIGHT – Strict Product Liability

140. Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 90 as if fully stated herein.

141. Porsche Defendants and Butcher were manufacturers, sellers or distributors of PFM N01 and N03 engines and their corresponding replacement engine parts.

142. Porsche Defendants and Butcher were responsible for the PFM N01 and N03 engine and/or its replacement parts entering the stream of commerce.

143. Porsche Defendants and Butcher sold and distributed the PFM engine and/or its replacement parts in an unreasonably dangerous condition.

144.     Porsche Defendants, via Butcher and other means, continuously provided maintenance and product support for the PFM N01 and N03 engines, yet had knowledge of, and failed to warn PFM aircraft owners of a product defect, which resulted in unsafe flying conditions.

145.     The PFM engine and/or its replacement parts reached owners of PFM aircraft, without substantial change in the condition in which the product was sold.

146.     As a result of the design defect in the PFM N01 and N03 engine, Plaintiffs have suffered economic and non-economic damages, to themselves and/or their property, for which Plaintiffs are entitled to recover. Plaintiffs also seek to recover consequential and punitive damages, pre- and post-judgment interest, and costs.

147.     The accrual of Plaintiffs' claims, if applicable, was delayed under the Discovery Rule, the Fraudulent Concealment Doctrine and the Continuing Tort Doctrine.

## COUNT NINE – Conspiracy to Commit Fraud

148.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 90 as if fully stated herein.

149.     Defendants were members of a combination of two or more persons.

150.     The objective of the group was to fraudulently induce Plaintiffs into relying upon Porsche Defendants' misrepresentations, as described above, in order to reclaim their PFM engines and relieve themselves of potential liability.

151.     The members of the group had a meeting of the minds as to how to achieve this unlawful objective, and subsequently began taking overt measures to achieve the

reclamation of their defective engines by, *inter alia*, the multitude of misrepresentations made by Porsche Defendants.

152.    As a result of this underlying conspiracy, Plaintiffs have suffered economic and non-economic damages, to themselves and/or their property, for which Plaintiffs are entitled to recover. Plaintiffs also seek to recover consequential and punitive damages, pre- and post-judgment interest, and costs.

## COUNT TEN – Conspiracy to Fraudulently Conceal

153.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 90 as if fully stated herein.

154.    Defendants were members of a combination of two or more persons.

155.    The objective of the group was to *inter alia*, suppress and minimize public knowledge (as well as knowledge within the community of PFM aircraft owners) that the PFM N01 and N03 engines had contained design defects, for purposes of evading their duties as a Type Certificate holder and subjecting Porsche Defendants to litigation.

156.    Such conspiracy to conceal included the destruction of evidentiary materials, such as PFM engines and their respective replacement parts.

157.    This ongoing conspiracy is evident in PAG's attempted surrender of the PFM Type Certificate, as well as Butcher and Porsche Defendants' attempts to conceal fraud, negligence, breach of warranty and deceptive and unfair trade practices.

158.    The members of the group had a meeting of the minds as to how to achieve these unlawful objectives, and subsequently began taking overt measures to achieve the concealment of the design defect by unlawfully making PFM engine replacement parts

unavailable. Such measures included an artificial, unsubstantiated and unconscionable increase in the prices of replacement parts.

159.    As a result of this underlying conspiracy to conceal, Plaintiffs have suffered economic and non-economic damages, to themselves and/or their property, for which Plaintiffs are entitled to recover. Plaintiffs also seek to recover consequential and punitive damages, pre- and post-judgment interest, and costs.

### COUNT ELEVEN – Promissory Estoppel

160.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 90 as if fully stated herein.

161.    Porsche Defendants and Butcher made representations of material fact, such that Plaintiffs would reasonably be expected to be induced into action or forbearance on the basis of these representations.

162.    Such representations include, but are not limited to::

i.      Representations that PAG would honor its duties as a Type Certificate holder;

ii.     Representations that PAG would redesign and replace the defective valve spring;

iii.    Representations that Porsche Defendants would find a solution to the PFM dilemma (PAG's withdrawal from aviation);

iv.     Representations that Porsche Defendants would find a reputable third party to effectuate the engine conversion;

v. Representations that the Porsche Defendants would continue to provide PFM engine replacement parts up through and until Mod Works completed the PFM engine conversion program; and

vi. Representations that the TCM conversion would add performance and value to Plaintiffs' aircraft.

163. The representations made by Porsche Defendants and Butcher did in fact induce PFM airplane owners to purchase or refrain from selling their aircraft powered by PFM N01 and N03 engines.

164. As a result of Porsche Defendants' and Butcher's promissory conduct, Plaintiffs suffered a monetary detriment; an amount which should rightly be returned.

## COUNT TWELVE – Unjust Enrichment/Restitution

165. Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 90 as if fully stated herein.

166. Porsche Defendants marketed, advertised and/or promoted the PFM engine as merchantable, free of defect, fit for the ordinary purpose for which it was to be used and safe for said purposes as set forth more fully above.

167. Owners of Porsche aircraft powered with PFM engines conferred a benefit to Porsche Defendants, by radically overpaying for PFM N01 and N03 engine replacement parts.

168. Porsche Defendants voluntarily accepted and retained these overpayments.

169. Plaintiffs did not receive PFM engines that were defect free, fit for ordinary purpose for which they were to be used and safe for said purchases.

170.   As a result of Porsche Defendants' unconscionable pricing, and failure to disclose the design defect, it would be inequitable for Porsche Defendants to retain this money, especially because the PFM engines were not free of defects, fit for ordinary purpose for which they were to be used and safe for said purpose.

## ESTOPPEL FROM PLEADING AND TOLLING OF
## APPLICABLE STATUTES OF LIMITATIONS

171.   Defendants are estopped from relying on any statutes of limitations by virtue of its acts of fraudulent concealment.  Defendants have known of the design defect in the PFM engine since at least 1987, if not earlier, and has concealed and/or failed to warn PFM aircraft owners of the defective nature of the engine.

172.   Given Defendants' failure to disclose this non-public information about the defective nature of the PFM engine – information over which it had exclusive control – and because Plaintiffs could not reasonably have known that the PFM engine was thereby defective, Defendants are estopped from relying on any statute of limitations that might otherwise be applicable to the claims asserted herein.

## REQUEST FOR ORDER PROHIBITING DESTRUCTION
## OR SPOILATION OF EVIDENCE

173.   Plaintiffs respectfully request that this Court issue an Order instructing Defendants not to destroy, discard or spoil any documents or records, whether written, recorded, or stored electronically, that may be or may have become relevant to any issue in this suit.  This request also applies to any piece of machinery, including but not limited to PFM engine or replacement parts or any piece of hardware related thereto.

## JURY TRIAL DEMAND

Plaintiffs hereby request and demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs PFM Air, Inc., Goedicke Inc of America, Peter Collinson Family, L.P., AB Consulting, Inc., Pacific Aeromarine, Inc., Chuck Hoffman, Elmer Linwood Johnson, Jack Williams and Doug Sheffield, respectfully requests this Court enter judgment against Defendants, Dr.Ing.hc.F.Porsche A.G., Porsche Cars North America, Inc., Porsche Aviation Products, Inc., and Gary Butcher, for aggregate damages of at least ONE HUNDRED MILLION DOLLARS ($100,000,000) in actual damages, *plus* punitive and/or exemplary damages, reasonable attorneys' fees and costs of this litigation, restitution and/or disgorgement of amounts paid by Plaintiffs, pre- and post-judgment interest at the highest rates allowed by law, costs of court, and all other appropriate relief at law or in equity to which Plaintiffs are justly entitled.

RESPECTFULLY SUBMITTED this 27th day of February, 2008.

Eugene Y. Barash, Trial Counsel
Illinois Bar Number 6280933
*Admission pending pursuant to Local Rule 2.02(a)*
FRIEDMAN & FEIGER, L.L.P.
5301 Spring Valley Road
Suite 200
Dallas, Texas 75254
(972) 788-1400 (Telephone)
(972) 776-5313 (Telecopier)
ebarash@fflawoffice.com

And

Michael R. Freed, Trial Counsel
Florida Bar Number 069205
BRENNAN, MANNA & DIAMOND, P.L.
76 South Laura Street, Suite 2110
Jacksonville, Florida 32202
(904) 366-1500
(904) 355-1501 (facsimile)
mrfreed@bmdpl.com