UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PFM AIR, INC., *et al.,*

        Plaintiffs,

v.                                          Case No: 8:08-cv-392-T-17MAP

DR. ING. H.C. F. PORSCHE A.G., *et al.*,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

This diversity action arises out of Porsche's foray into the aircraft engine business. The Plaintiffs, who are owners of private aircraft with Porsche engines, claim the engines were faulty. They further claim Defendants failed to live up to their warranty obligations and fraudulently took actions to avoid liability for the defects in the engines. Defendant Dr. Ing.hc.F.Porsche Aktiengesellschaft ("PAG") and Defendant Gary Butcher now move under Rule 12(b)(2) to dismiss for lack of personal jurisdiction (doc. 146). The district judge, pursuant to her authority under 28 U.S.C. §636(b)(1), referred this matter to me for a report and recommendation (doc. 147). After conducting an evidentiary hearing on the matter, I find PAG's contacts with Florida satisfy the state's long arm statute and the Court's exercise of personal jurisdiction comports with due process. I further conclude there is no basis for revisiting the district court's determination that it has personal jurisdiction over Gary Butcher. Accordingly, I recommend the motion be denied.

*A. Background*

    *1. The parties*

Plaintiffs PFM Air, Inc., Goedicke Inc. of America, Peter Collinson Family, LP, AB Consulting, Inc., Pacific Aeromarine, Inc., Elmer Linwood Johnson, Chuck Hoffman, Doug Sheffield, and Jack Williams own Mooney aircrafts containing Porsche PFM engines.  PFM Air and Goedicke are Florida corporations with their principal place of business in Palmetto, Florida.  The remaining corporate Plaintiffs are entities formed under the laws of states other than Florida and have their principal places of business outside of Florida.  The individual Plaintiffs are citizens of states other than Florida.

Defendant PAG is a corporation organized under the laws of Germany with its principal place of business in Stuttgart, Germany.  PAG is the parent company of Defendants Porsche Cars North America, Inc. ("PCNA") and Porsche Aviation Products, Inc. ("PAPI").  Those subsidiaries are corporations organized under the laws of Delaware, with their principal places of business in Atlanta, Georgia.  Collectively, these three defendants will be referred to as the Porsche Defendants.  Defendant Gary Butcher is a citizen of Nevada and at all relevant times was an employee of PCNA or PAPI.

    *2. Factual and Procedural History*

PAG manufactured the Porsche PFM engine in Germany from the mid 1980s until about 1989. (Doc. 113 at 121; doc. 43 at ¶ 3.)  To engage in the manufacture and sale of aircraft engines, PAG had to obtain a Type Certificate ("TC") from the relevant regulatory authorities, including the Federal Aviation Administration ("FAA").  As owner of the TC, Porsche was entitled to manufacture the engine and replacement parts or authorize someone else to

manufacture parts subject to the approval of the relevant regulatory authority.  (Doc. 135 ¶¶ 25-26.)

PAPI was PAG's distribution agent in the United States for the Porsche PFM engines.  (Doc. 113 at 88.)  About forty Porsche PFM engines were sold to Mooney for installation in their aircraft in Texas.  (Doc. 113 at 88, 91.)  Although the paperwork for the engine sales went through PAPI, the engines went directly from Germany to Mooney.  (Doc. 113 at 88.)  The Mooney aircraft were marketed and offered for sale in various locations throughout the United States, including Florida.  (Doc. 113 at 136.)

The Porsche PFM engines were covered by a Customer Assurance and Warranty Program.  (Doc. 134-2.)  The PFM warranty program automatically transferred with the sale of the aircraft subject to compliance with specified terms.  (Doc. 134-2 at 8.)  The warranty program was provided in the United States by PAPI.  (Doc. 134-2; doc. 113 at 89-90.)  PAG stopped production of the engine in about 1989, but continued to provide support for it.  Butcher represented that PAG would continue to support the engine.  (Doc. 113 at 102-04.)

In October 1998, the LBA, the German equivalent of the FAA, issued an Airworthiness Directive warning owners of aircraft containing the Porsche PFM engines about valve spring fatigue failures.  (Doc. 134-5.)  The FAA followed suit in early 1999.  (Doc. 134-7.)  PAG issued a Service Bulletin stating the valve springs would be replaced immediately with valve springs of the old design, but that a new valve spring assembly was being developed by PAG.  (Doc. 134-8.)  Shortly thereafter, however, the Porsche Defendants began to notify owners that PAG would

discontinue production of engine parts for the Porsche PFM engine.[1] (Doc. 113 Defendant's Ex. 1 at 1; doc. 57-6, -7, and -8.)

After the Porsche defendants announced withdrawal of support for the Porsche PFM engines, Timothy Coon, the President of Mod Works Aviation in Punta Gorda, Florida, approached Butcher about setting up a program to extend the service life of aircraft containing the Porsche PFM engine. (Doc. 113 at 97.) PAPI's board solicited ideas from other companies, but ultimately decided the Mod Works opportunity was best. (Doc. 113 at 98.) The Mod Works plan was to remove the Porsche PFM engines and replace them with a different engine already in use by Mooney in other aircraft. (Doc. 113 at 99.) The idea was that after the conversion the aircraft owners would have an engine that did not require PAG parts and was covered by a different warranty (doc. 113 at 99).

The contract for the conversion venture was entered into by Mod Works and PAPI. (Doc. 113 at 100.) PAPI agreed to pay a substantial amount of money for marketing costs and Supplemental Type Certificate ("STC") development.[2] (Doc. 113 Defendant's Exs. 1-4; doc. 113 at 101.) PAPI also agreed to purchase the Porsche PFM engines removed during the conversion. (Doc. 113 at 101.) According to Butcher, PAPI and Mod Works "worked out the contracts and the monies involved and then…asked PAG if they would support…[the] venture," which PAG did. (Doc. 113 at 102, 120.)

---

[1] Although a PAG document says notice was provided in 2000, there is in the record a December 1995 letter from Butcher to Plaintiff Jack Williams stating PAG would "continue to supply spare parts and support through the year 2005." (Doc. 57-2.)

[2] To implement the conversion program, Mod Works had to obtain a STC from the FAA. (Doc. 113 at 100.)

4

Case 8:08-cv-00392-MAP   Document 158   Filed 08/04/10   Page 5 of 19 PageID 2459

Even before the conversion venture was finalized, the Porsche Defendants discussed and offered the conversion plan to owners of aircraft containing the Porsche PFM engine. In the late 1990s, Plaintiff Williams attended a Mooney Airplane Pilots Association convention in Las Vegas, during which Butcher discussed the conversion program. (Doc. 113 at 132; doc. 134-3 at ¶ 4.) In his declaration, Williams states a representative from PAG also was present and discussed the conversion program (Doc. 134 Ex. C at ¶ 4), but Butcher does not remember anyone from PAG being present (doc. 113 at 133).

Plaintiff Linwood Johnson purchased a PFM Mooney some time after the summer of 2001 based in large part on Butcher's representations that installation of a different engine would improve aircraft performance and increase the aircraft's value. (Doc. 153-4 at ¶ 5.) Johnson signed an agreement in February 2002 for the conversion (doc. 153-4 at ¶ 14), but the conversion was never performed. (Doc. 153-4 at ¶ 17.) At one point, Johnson paid $13,000 to have a former Porsche factory employee "fly to South Carolina from Germany to bring and install parts in [his] airplane in order to maintain its airworthiness." (Doc. 153-4 at ¶ 17.)

Adam Braun of Plaintiff AB Consulting, Inc. purchased a PFM Mooney in 1991. Butcher serviced the aircraft. Between 2001 and 2003, Butcher informed Braun that Porsche would no longer provide parts or services, and that his "only option was to have the Porsche engine replaced in Florida at a company set up by Porsche to install a different engine." (Doc. 153-3 at ¶ 3.) Braun signed an agreement to have the conversion performed, but "Porsche dropped the project and [his] airplane still has its original Porsche engine." (Doc. 153-3 at ¶ 4.) Braun is "not able to use [his] airplane now because [he] cannot get parts to maintain its airworthiness." (Doc. 153-3 at ¶ 6.)

Plaintiff Sheffield delivered his aircraft to Mod Works for conversion in June 2003, and picked up the aircraft in December 2003, with the conversion only partially completed. (Doc. 134-4 at ¶ 4.) Plaintiff Williams also converted his aircraft with Mod Works, and alleges significant problems with the aircraft since the conversion. (Doc. 134-3 at ¶ 6.)

In 2003, Butcher informed Frank Collinson, the general partner of Plaintiff Peter Collinson Family, LP, which owned a PFM Mooney, that Porsche would not provide parts or service for the Porsche engines, and that his "only option" "was to surrender [his] Porsche engine to Porsche." (Doc. 153-1 at ¶ 3.) Collinson entered into an agreement with Mod Works. Much of the conversion had been completed when Hurricane Charley passed through Punta Gorda and interrupted the conversion. (Doc. 153-1 at ¶¶ 4-5.) Collinson had to negotiate "among three different aircraft maintenance firms, including Mod Works, and [] pay out another 35,000, to get the work completed." (Doc. 153-1 at ¶5.) The entire process took five years, during which time the aircraft remained in Florida. Collinson states the useful load of the aircraft was so reduced by the conversion that the aircraft does not have the same value. (Doc. 153-1 at ¶¶ 5-6.)

Plaintiff Chuck Hoffman owns two PFM Mooneys, one in his name and one in the name of Plaintiff Pacific Aeromarine, Inc. (Doc. 153-2 at ¶ 3.) Before purchasing the aircraft, he knew of the Mod Works conversion plan. (Doc. 153-2 at ¶ 5.) The information he received from Mod Works (and Butcher), "promised improved performance and greater value for the airplanes." (Doc. 153-2 at ¶ 6.) He signed a contract for an engine conversion on the aircraft owned in the name of Pacific Aeromarine. The conversion was completed in Florida. (Doc. 153-2 at ¶ 7.) The Porsche engine that was removed was destroyed by Porsche. (Doc. 153-2 at ¶ 8.) Hoffman states the converted airplane is slower than it was represented it would be and "does not have a

sufficient useful load, essentially making the airplane useless, except for a pilot who would want to fly around alone." (Doc. 153-2 at ¶ 8.)

The conversion program terminated when Hurricane Charley destroyed the Mod Works facility in August 2004. (Doc. 134 at ¶ 68.) PAG stopped selling Porsche PFM engine parts at the end of May 2005 (doc. 113 at 87), and PAPI became inactive. (Doc. 113 at 133.) In October 2007, PAG surrendered its TC for the PFM 3200 engine. Plaintiffs allege PAG "did not provide to the FAA or anyone else the technical data necessary to manufacture spare parts," thereby creating an unsafe condition. (Doc. 135 at ¶ 45.)

Plaintiffs brought this diversity action, asserting various claims relating to the Porsche engines. PAG and Gary Butcher each moved to dismiss the claims against them for lack of personal jurisdiction. The district court denied Butcher's motion, finding it had personal jurisdiction over him. (Doc. 46) As to PAG's motion, the district court judge deferred ruling on the motion and referred it to me for hearing and report and recommendation. (Doc. 66)

On August 5, 2009, I held an evidentiary hearing on this matter (doc. 110). Due to pleading issues, I ordered Plaintiffs to replead (doc. 107). There are two separate groups of Plaintiffs, each with its own amended complaint. The first group consists of PFM Air, Inc., Goedicke Inc. of America, Peter Collinson Family, LP, AB Consulting, Inc., Pacific Aeromarine, Inc., Chuck Hoffman, and Elmer Linwood Johnson. In their amended complaint, these Plaintiffs assert claims of negligence, intentional tort, and violation of the Florida Deceptive and Unfair Trade Practice Act ("FDUTPA") (doc. 135). They base their claims on Defendants' failure to correct mechanical problems, destruction of spare parts, destruction of airplane engines, discontinuation of the manufacture of spare parts, and surrender of the type certificate without

providing the technical data someone else would need to manufacture spare parts (doc. 135). They seek actual and punitive damages, as well as attorneys' fees, costs, and interest.

The second group of Plaintiffs consists of Jack Williams and Doug Sheffield. In their amended complaint, they assert claims of: (1) fraud as to numerous representations made by the Porsche Defendants; (2) negligence, including in design, manufacture, marketing, implementation of safety program, product support, and maintenance; (3) gross negligence as to implementation of safety program, product support, and maintenance; (4) breach of express warranty; (5) breach of implied warranty of merchantability, under Fla. Stat. § 672.314 et seq.; (6) violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.210 et seq.; (7) strict product liability; (8) conspiracy to commit fraud; (9) conspiracy to fraudulently conceal the engine design defect; (10) promissory estoppel relating to representations in connection with the Porsche PFM engine and conversion program; (11) unjust enrichment/restitution; and (12) alter ego/single business enterprise (doc. 134). They seek actual and punitive damages, as well as restitution and/or disgorgement, attorneys' fees, costs, and interest.

Defendants PAG and Butcher moved to dismiss the amended complaints for lack of personal jurisdiction (doc. 146), and the district court judge once again referred the matter to me for report and recommendation. (Doc. 147.) The parties informed the Court at the July 6, 2010, status conference that no further evidentiary hearing is required (Doc. 156).

### B. *Personal Jurisdiction*

A federal court sitting in diversity may properly exercise personal jurisdiction over a defendant only if such exercise: (1) is permissible under the state long-arm statute; and (2) whether the district court's exercise of jurisdiction comports with the Due Process Clause of the

Fourteenth Amendment. *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 (11th Cir. 1999); *see also PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 808 (11th Cir. 2010).

"The plaintiff bears the burden of establishing a prima facie case of jurisdiction over the movant, non-resident defendant." *PVC Windoors, Inc.*, 598 F.3d at 810 (citation and punctuation omitted). A plaintiff establishes a prima facie case where it "presents affidavits or deposition testimony sufficient to defeat a motion for judgment as a matter of law." *Id.* (citation omitted). "Where the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must construe all reasonable inferences in favor of the non-movant plaintiff." *Id.* (citation and quotations omitted). If those inferences suffice to defeat a motion for judgment as a matter of law, the court will find jurisdiction exists. *Id.* However, when a court holds an evidentiary hearing, the "court determines the credibility of witness testimony, weighs the evidence, and finds the relevant jurisdictional facts." *Id.*

    C.  Discussion

        1. Gary Butcher

As stated above, Gary Butcher has renewed his motion to dismiss for lack of personal jurisdiction. His renewal is based on the fact that the Plaintiffs have filed amended complaints. This is akin to a motion for reconsideration. "A motion for reconsideration must demonstrate one of three grounds recognized by courts: (1) an intervening change in controlling law; (2) the availability of new evidence; (3) the need to correct clear error or manifest injustice." *McDonough v. Americom Internat'l Corp.*, 905 F. Supp. 1016, 1023 (M.D. Fla. 1995) (citation omitted); *see also Association for Diabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 477

9

(S.D. Fla. 2002) ("There must be a reason why the court should reconsider its prior decision and the moving party must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision."). The causes of action in the amended complaints and the allegations on which those causes of action are based are similar to those in the original complaint; accordingly, the district court need not revisit its decision.

2. PAG

*a. Florida long-arm statute*[3]

This Court is required to construe the Florida long-arm statute as would the Florida Supreme Court. *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 856 (11th Cir. 1990). Florida's long-arm statute is strictly construed. *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996).

It is not entirely clear on which of the Florida long-arm provisions Plaintiffs rely. In their opposition to PAG's 2008 motion to dismiss for lack of personal jurisdiction, which Plaintiffs have incorporated into their responses to PAG's 2010 motion to dismiss, Plaintiffs quoted the following provisions:

> (1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
> (a) Operating, conducting, engaging in, or carrying on a business or business venture in

---

[3] "In Florida, before a court addresses the question of whether specific jurisdiction exists under the long-arm statute, the court must determine 'whether the allegations of the complaint state a cause of action.'" *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802 (11th Cir. 2010) (quoting *Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002)). However, Defendants in this case do not present any argument that the allegations of the complaint fail to state a cause of action.

> this state or having an office or agency in this state.
> (b) Committing a tortious act within this state.
> …
> (f) Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:
>> 1. The defendant was engaged in solicitation or service activities within this state; or
>> 2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

Fla. Stat. § 48.193. Plaintiffs' argument did not, however, specifically address any particular subsection of the long-arm statute, instead stating generally that there is jurisdiction because PAG, through its subsidiaries/agents, committed fraud or an intentional tort while engaging in business in Florida the State of Florida. In their responses to PAG's 2010 motion to dismiss, neither set of Plaintiffs specifies on which subsection of the long-arm statute they rely.

  The first requirement under Fla. Stat. § 48.193(1) is that the cause of action must have a connection to the Florida contacts. *New Lenox Indus., Inc. v. Fenton*, 510 F. Supp. 2d 893, 902 (M.D. Fla. 2007). To establish jurisdiction under §48.193(1)(a), the Court is to consider whether "the sum of the defendant's collective business activities in Florida shows a general course of business activity in the state for pecuniary benefit." *Nida Corp. v. Nida*, 118 F. Supp. 2d at 1227. "It is not necessarily the number of transactions, but rather the nature and extent of the transaction(s) that determine[] whether a person is 'carrying on a business or business venture' within the state." *Joseph v. Chanin*, 869 So.2d 738, 740 (Fla. 4th DCA 2004) (citation omitted). "A 'business venture' can consist of a single project or transaction." *Atlantis Marina & Yacht Club, Inc. v. R&R Holdings, Inc.*, 766 So.2d 1163, 1165 (Fla. 3d DCA 2000) (citation omitted).

  To establish jurisdiction under the § 48.193(1)(b) tortious activity prong of the long-arm

statute, a plaintiff "must demonstrate that the non-resident defendant committed a substantial aspect of the alleged tort in Florida by establishing that the activities in Florida were essential to the success of the tort." *Cable/Home Commc'n, Inc.*, 902 F.2d at 857 (citation and punctuation omitted). Finally, § 48.193(1)(f) "contemplate[s] personal injury or physical property damage" within the State of Florida. *Aetna Life & Cas. Co. v. Therm-O-Disc, Inc.*, 511 So.2d 992, 994 (Fla. 1987). I conclude jurisdiction is proper under § 48.193(1)(a) and (b) and limit my analysis accordingly.

Upon consideration of the evidence, I conclude PAG was intimately involved with the conversion program at Mod Works. Although Butcher testified that PAG did not have any role in the Mod Works conversion program other than providing the funding for PAPI's end of the bargain (Doc. 113 at 102), the correspondence between the various individuals involved in the conversion venture shows otherwise. In August 2001, Sprenger at PAG instructed Dr. Lindheim at PCNA to forward to Sprenger the first draft of the contract with Mod Works as well as the first draft of the contract Mod Works would enter into with aircraft owners. (Doc. 113, Plaintiffs' Ex. 20.) Additionally, in a July 2002 communication, Sprenger chastised Coon about stopping the project, reminded Coon that "[w]e have a contract with you," and demanded to continue with the project immediately to reach the agreed date for getting the STC. (Doc. 113, Plaintiffs' Ex. 18.) In a December 3, 2003, letter to Sprenger, Coon referenced Sprenger's "requirement" that Mod Works execute a plan to achieve a "3 per month production rate." (Doc. 113, Plaintiffs' Ex. 16 at 1.) Coon stated "Mod Works is once again faced with changing the plan and absorbing additional cost due to a Porsche change in our plan." (*Id.* at 2.) Coon further expressed displeasure about the decision of Dr. Lindheim at PCNA to deny access to access to a line of

credit and appealed to Sprenger for guidance as to how Mod Works should proceed with the conversion program. (*Id.* at 2-3.) Coon also stated Mod Works had "consumed an additional $203,000 in cash in this program above your investment" and Mod Works needed access to the $2 million line of credit as necessary. (*Id.* at 4.)

      I further conclude PAPI's (and therefore Butcher's) contacts with Florida should be attributed to PAG. Although a foreign corporation generally is not subject to personal jurisdiction based on the forum contacts of a subsidiary, the Florida long-arm statute specifically references contacts of an agent. *See* Fla. Stat. § 48.193(1) ("Any person…who personally or *through an agent*…" (emphasis added)). Jurisdiction under an agency theory may be established if a plaintiff establishes "'the subsidiary is merely an agent through which the parent company conducts business in a particular jurisdiction or its separate corporate status is formal only and without any semblance of individual identity.'" *Meier ex rel. Meier v. Sun Internat'l Hotels, Ltd.*, 288 F.3d 1264, 1272 (11th Cir. 2002) (quoting Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1069.4 (3d ed. 2002)). Agency attribution is not limited to the parent-subsidiary context, but rather extends to other affiliate relationships. *See Meier*, 288 F.3d at 1273 ("Personal jurisdiction over affiliated parties, whether a parent or another related subsidiary, is warranted when the resident corporation acts on behalf of those foreign affiliates." (citations omitted)); *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1361 (11th Cir. 2006) (may attribute contacts of subsidiary or other affiliate upon required agency showing). Control is critical to finding agency. *Nida Corp.*, 118 F. Supp. 2d at 1227. Another factor to consider is whether the nonresident corporation would perform the equivalent services if its subsidiary did not exist. *Meier*, 288 F.3d at 1275.

Butcher testified PAPI tried to maintain the corporate formalities. (Doc. 113 at 105.) The independence of PAPI is, however, belied by Butcher's other testimony. PAPI did not support itself. Butcher testified his understanding was that PAPI's funding came from PAG through PCNA. (Doc. 113 at 93.) PAPI existed to provide support in the United States (and for two aircraft in Australia) for the Porsche PFM engine. (Doc. 113 at 89-90.) In fact, PAPI became inactive once PAG ceased support of the aircraft engines. (Doc. 113 at 87.)

Butcher was the only employee of PAPI. (Doc. 113 at 97.) The function he performed in the United States was performed by a PAG employee for engines in Europe (doc. 113 at 90, 107, and 109), thus suggesting PAG would perform the function in the absence of PAPI. There also is some suggestion in the record that PAG had some control over Butcher's salary—Detlef Konigsmann at PAG inquired of Karen Mueller at PCNA as to why the salary of Gary Butcher was as high as it was. (Doc. 113, Plaintiffs' Ex. 11.)

Butcher was trained in Germany and in the United States by PAG employees. (Doc. 113 at 106.) Butcher worked with PAG to keep track of where the Porsche PFM engines were located. (Doc. 113 at 95-96.) He also assisted PAG by proofing technical bulletins for the Porsche PFM engines. (Doc. 113 at 96.) Butcher was responsible for passing the bulletins on to owners of aircraft containing the Porsche PFM engines.[4] (Doc. 113 at 96.)

PAG has made much of Butcher's testimony that he had authority to determine PAPI's inventory and the pricing of parts. (Doc. 113 at 89, 92.) The evidence, however, establishes final authority over the parts rested with PAG. In 2005, PAG ordered PAPI to destroy all spare parts in its inventory, including engines used for display purposes and parts that still were

---

[4] PAG provided the bulletins to the FAA. (Doc. 113 at 43.)

saleable and useable. (Doc. 113 at 92, 124-126, Plaintiffs' Ex. 46). Moreover, Butcher testified that PAG has access to the parts he sold, and in fact stated around 2005 that the Germans were looking over his shoulder. (Doc. 113 at 128.)

Additionally, the pricing passed along to the customers under the warranty program was determined by PAG. (Doc. 113 at 107.) Although the Porsche PFM engine warranty for aircraft sold in the United States was issued in PAPI's name (doc. 134-2; doc. 113 at 90), PAG controlled the warranty program. PAG reimbursed PAPI for the warranty work it did (doc. 113 at 93). When a part was repairable, it was PAG that performed the repairs. (Doc. 113 at 93.) PAG also was the entity that performed complete engine overhauls because Butcher did not have the training to do them. (Doc. 113 at 108.) PAG's control is further evidenced by a June 1997 letter to Butcher from Detlef Konisgmann at PAG instructing that for economic reasons PAG would not be performing engine overhauls and would instead offer customers "an exchange aggregate to the overhauling price." (Doc. 113 at 108 & Plaintiffs' Exhibit 5.) Additionally, in a March 1997 letter, Konigsmann instructed Butcher regarding the conditions under which a repair would be covered by warranty and stated PAG "will pay the bill" if the repair is covered by warranty. (Doc. 113 Plaintiffs' Exhibit 6.)

Because PAPI "manifest no separate corporate interest of its own and functions solely to achieve the purpose" of PAG, I conclude PAPI's (and Butcher's) contacts with Florida can be attributed to PAG.[5] *Meier*, 288 F.3d at 1273 (citation and quotations omitted). Those contacts

---

[5] I note the requisite contacts for personal jurisdiction may also in an appropriate case be established under an alter ego theory. In order to establish alter ego, a plaintiff must establish both that the resident corporation was a mere instrumentality and that it was used for improper conduct. *Mother Doe I v. Al Moktoum*, 632 F. Supp. 2d 1130, 1140 (S.D. Fla. 2007). As I conclude attribution to PAG of PAPI's and Butcher's contacts is appropriate under an agency

15

consist of the Mod Works conversion venture, as well as PAPI's sale of parts and provision of service in Florida. Butcher testified that PAPI sent Porsche PFM engine parts to Boca Raton, Miami, and Mod Works in Punta Gorda (doc. 113 at 94-95), and provided service on Porsche PFM engines in Boca Raton, Miami, Orlando, and somewhere north of Tampa. (Doc. 113 at 119.)

Plaintiffs' claims certainly have a connection to PAG's Florida contacts. In addition, PAG's involvement and control over the Mod Works conversion program establishes that PAG was engaged in a business venture in Florida such that jurisdiction is appropriate under § 48.193(1)(a). Moreover, since the conversion program is a substantial aspect of the torts alleged by both sets of Plaintiffs, I conclude jurisdiction also is appropriate under § 48.193(1)(b).

### b. due process analysis

Having concluded Florida's long-arm statute is satisfied, this Court must determine whether due process requirements are met, considering: (1) the defendant's contacts with Florida; and (2) whether the exercise of personal jurisdiction over the nonresident defendant would offend "traditional notions of fair play and substantial justice." *Posner*, 178 F.3d at 1220 (citation and quotations omitted).

### 1. minimum contacts

The Eleventh Circuit has articulated a three-part minimum contacts test:

> First, the contacts must be related to the plaintiff's cause of action…Second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum. Third, the defendant's contacts with the forum must be such that the defendant should reasonably anticipate being haled into court there.

---

theory, I do not address alter ego.

*Posner*, 178 F.3d at 1220 (quoting *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir. 1993)). Even one significant single act or meeting in the forum state may be sufficient to establish personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n. 18 (1985); *Williams Elec. Co., Inc. v. Honeywell, Inc.*, 854 F.2d 389, 392-93 (11th Cir. 1988). Resolution of the minimum contacts issue depends on whether the case arises out of or relates to the defendant's contacts with Florida. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). An entity has fair warning if it "'purposefully directs' [its] activities at the forum, and claims of injury result from these activities." *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1356 (11th Cir. 2000) (citing *Burger King Corp.*, 471 U.S. at 472).

   The Mod Works conversion program underlies both sets of Plaintiffs' claims. This is not a case where a defendant simply had a contract with an entity in the forum state. *Cf. SeaLift, Inc. v. Refinadorea Constarricense de Petroleo, S.A.*, 792 F.2d 989, 993 (11th Cir. 1986) (existence of contract between a foreign defendant and a resident of the forum state does not automatically amount to purposeful availment). Rather, PAG entered into this venture with Mod Works and thereby actively attempted to effect the removal and destruction of all Porsche PFM engines, and did in fact effect the removal and destruction of some of the Porsche PFM engines. Although PAG and its agents represented the conversion program would result in a benefit to aircraft owners, the record shows that was not the case. Several of the Plaintiffs allege they suffered injury when they delivered their aircraft to Florida for the conversion. By engaging in the Mod Works venture, PAG availed itself of the privilege of conducting activities in Florida and reasonably should have anticipated being haled into court on claims arising from or relating to

that venture.

### 2. *fair play and substantial justice*

Even where a defendant has purposefully established minimum contacts with the forum state, the court still must evaluate jurisdiction in light of several other factors to determine whether the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Meier*, 288 F.3d at 1276. When assessing fairness, courts look to: "(a) the burden on the defendant, (b) the forum State's interest in adjudicating the dispute, (c) the plaintiff's interest in obtaining convenient and effective relief, (d) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (e) the shared interest of the several States in furthering fundamental substantive social policies." *Meier*, 288 F.3d at 1276 (citations omitted). At this juncture, PAG bears the burden of establishing a compelling case that the exercise of jurisdiction is unreasonable. *Burger King, supra,* 471 U.S. at 477; *see also Licciardello v. Lovelady*, 544 F.3d 1280, 1284 (11th Cir. 2008) ("Where these factors do not militate against otherwise permitted jurisdiction, the Constitution is not offended by its exercise." (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980))).

PAG has not established that this Court's exercise of jurisdiction over it is unreasonable. There is no indication that requiring PAG to litigate in this jurisdiction would impose an unreasonable burden on PAG. Additionally, Florida certainly has an interest in adjudicating a dispute arising in part due to activities carried on within its borders.

For the reasons stated above, it is hereby

RECOMMENDED:

1. Defendant Dr. Ing. hc. F. Porsche Aktiengesellschaft ("PAG") and Defendant Gary

Butcher's motion under Rule 12(b)(2) to dismiss for lack of personal jurisdiction (doc. 146) be DENIED.

IT IS SO REPORTED at Tampa, Florida, on August 4, 2010.

*Mark A. Pizzo*
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. § 636(b)(1).

cc:     Hon. Elizabeth A. Kovachevich